IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NELLSON NUTRACEUTICAL, INC., et al., [1] | Case No. 06-10072 (CSS) |
| Debtors. | Jointly Administered<br>Related Docket Nos. 992 and 993 |

## **NOTICE OF APPEAL**

The Informal Committee of First Lien Lenders of the above-captioned debtors

and debtors-in-possession (collectively, the "Debtors") hereby appeal as of right pursuant to 28

U.S.C. §158(a) and Rule 8001 of the Federal Rules of Bankruptcy Procedure from the Order

[Docket No. 993] determining that the Debtors' enterprise value is $320,000,000.00 for the

reasons set forth in the accompanying Findings of Fact and Conclusions of Law dated and

entered on January 18, 2007 [Docket No. 992] by The Honorable Christopher S. Sontchi in the

above-captioned bankruptcy cases.

The names of all parties to the order appealed from and the names, addresses and

telephone numbers of the respective attorneys are as follows:

1.    Informal Committee of First Lien Lenders:

AKIN GUMP STRAUSS HAUER & FELD LLP
Fred S. Hodara, Esq. (admitted *pro hac vice*)
Abid Qureshi, Esq. (admitted *pro hac vice*)
590 Madison Avenue
New York, New York 10022
Telephone: (212) 872-1000

---

[1]    The Debtors are: Nellson Nutraceutical, Inc., Nellson Holdings, Inc., Nellson Intermediate
Holdings, Inc., Nellson Northern Operating, Inc., Nellson Nutraceutical Eastern Division, Inc., Nellson
Nutraceutical .Powder Division , Inc. and Vitex Foods, Inc.

-and-

Scott L. Alberino, Esq. (admitted *pro hac vice*)
1333 New Hampshire Avenue, N.W.
Washington, DC 20036
Telephone:  (202) 887.4000


YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady, Esq. (No. 2847)
M. Blake Cleary, Esq. (No. 3614)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253


2.    Debtors and Debtors-in-Posession:

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
Laura Davis Jones, Esq. (Bar No. 2436)
Richard M. Pachulski, Esq. (CA Bar No. 90073)
Brad R. Godshall, Esq. (CA Bar No. 105438)
Maxim B. Litvak, Esq. (CA Bar No. 215852)
Rachel Lowy Werkheiser, Esq. (Bar No. 3753)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705
Telephone: (302) 652-4100
Facsimile: (302) 652-4400


3.    Official Committee of Unsecured Creditors:

REED SMITH, LLP
Kurt F. Gwynne, Esq.
Thomas Francella, Jr., Esq.
201 Market Street, 15th Street
Wilmington, DE  19801
Telephone: (302) 778-7550
Facsimile: (302) 778-7575

-and-

065087.1001

Claudia Springer, Esq.
2500 One Liberty Place
650 Market Street
Philadelphia, PA 19103
Telephone:(215) 851-8100
Facsimile: (215) 851-1420

4.      UBS, AG Stamford Branch:

DUANE MORRIS LLP
Richard W. Riley, Esq.
1100 North Market Street, Ste 1200
Wilmington, DE 19801-1246
Telephone: (302) 657-4900
Facsimile: (302) 657-4901

-and-

James J. Holman, Esq.
30 South 17th Street
Philadelphia, PA 19103-1530
Telephone: (215) 979-1530
Facsimile: (215) 979-1020

-and-

MILBANK TWEED HADLEY & MCCOY LLP
Gregory A. Bray, Esq.
Linda Dakin-Grimm, Esq
Thomas R. Kreller, Esq.
Jason B. Baim, Esq.
601 South Figueroa Street, 30th Floor
Los Angeles, CA 90017
Telephone: (213) 892-4000
Facsimile: (213) 629-5063

The names of other interested parties to the order appealed from and the names, addresses, and telephone numbers of their respective attorneys are as follows:

4.    The Office of the United States Trustee:

OFFICE OF THE UNITED STATES TRUSTEE
William K. Harrington, Esq.
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE  19801
Telephone: (302) 573-6491

Dated: Wilmington, Delaware
       January 29, 2007

_____
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (Del. No. 2847)
M. Blake Cleary (Del. No. 3614)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

-and-

AKIN GUMP STRAUSS HAUER & FELD LLP
Fred S. Hodara (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
590 Madison Avenue
New York, New York 10022
Telephone: 212.872.1000
Facsimile: 212.872.1002

-and-

Scott L. Alberino (admitted *pro hac vice*)
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: 202.887.4000
Facsimile: 202.887.4288

Attorneys for the Informal Committee
of First Lien Lenders

065087.1001

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

**APPEAL TRANSMITTAL SHEET**

Case Number:  __06-10072_____    ◉ BK   ○ AP
      If AP, related BK Case Number: _____

Title of Order Appealed:
 Order Re: Enterprise Value of the Debtors _____

            Docket Number: _993_____        Date Entered: _1/18/07_____

Item Transmitted:    ◉ Notice of Appeal          ○ Motion for Leave to Appeal
                     ○ Amended Notice of Appeal   ○ Cross Appeal
                     Docket Number: _1021_____    Date Filed: _1/29/07_____

*Appellant/Cross Appellant:              *Appellee/Cross Appellee
 Informal Committee of First Lien Lenders   Nellson Nutraceutical, Inc. _____ ▪
Counsel for Appellant:                   Counsel for Appellee:
 Robert S. Brady, M. Blake Cleary, ____ ▪  Laura Davis Jones, Richard M. Pachulski, _____
 Fred S. Hodara, Abid Oureshi, _____ ▪  Brad R. Godshall, Maxim B. Litvak, _____
 Scott L. Alberino _____ ▪  Rachel Lowy Werkheiser _____
 _____          _____
 _____          _____

*If additional room is needed, please attach a separate sheet.

Filing Fee paid?   ◉ Yes   ○ No

IFP Motion Filed by Appellant?   ○ Yes   ◉ No

Have Additional Appeals to the Same Order been Filed?  ○ Yes   ◉ No
      If so, has District Court assigned a Civil Action Number?   ○ Yes  ○ No   Civil Action # _____

Additional Notes:
 Appellant and Appellee did not file designation of items _____

  _2/9/07_____          By: _Lisa M. Ciconte_____
 Date                                    Deputy Clerk

                                      FOR USE BY U.S. BANKRUPTCY COURT

Bankruptcy Court Appeal (BAP) Number: _07-5_____
7/6/06

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
In Re:                        )    Chapter 11
                              )    Case No. 06-10072 (CSS)
NELLSON NUTRACEUTICAL, INC.,  )
et al.,                       )    (Jointly Administered)
                              )    Related Docket No. 333
                   Debtors.   )
```

## ORDER

For the reasons set forth in the Court's Findings of Fact and Conclusions of Law of this date, the Court concludes that, as of December 31, 2006, the Debtors' enterprise value is $320 million.


_Christopher S. Sontchi_
Christopher S. Sontchi
United States Bankruptcy Judge

Dated: January 18, 2007

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In Re: ) | Chapter 11 |
| ) | Case No. 06-10072 (CSS) |
| NELLSON NUTRACEUTICAL, INC., ) | |
| et al., ) | (Jointly Administered) |
| ) | Related Docket No. 333 |
| Debtors. ) | |

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Laura Davis Jones, Esquire
Curtis A. Hehn, Esquire
Rachel Lowy Werkheiser, Esquire
Pachulski, Stang, Ziehl, Young,
Jones & Weintraub
919 N. Market Street, 16th Floor
Wilmington, DE 19801

Brad R. Godshall, Esquire
Alan J. Kornfeld, Esquire
Pachulski, Stang, Ziehl, Young,
Jones & Weintraub
10100 Santa Monica Boulevard,
Suite 1100
Los Angeles, CA 90067

Counsel for Debtors and Debtors
in Possession

Robert S. Brady, Esquire
M. Blake Cleary, Esquire
Margaret B. Whiteman, Esquire
Young Conaway Stargatt &
Taylor, LLP
P.O. Box 391
Wilmington, DE 19899-0391

Kurt F. Gwynne, Esquire
Thomas Francella, Jr., Esquire
Reed Smith, LLP
201 Market Street, 15th Floor
Wilmington, DE 19801

Claudia Springer,Esquire
Reed Smith, LLP
2500 One Liberty Place
650 Market Street
Philadelphia, PA 19103

Counsel for the Official
Committee Of Unsecured
Creditors

Richard W. Riley, Esquire
Duane Morris, LLP
1100 North Market Street
Suite 1200
Wilmington, DE 19801-1246

James J. Holman, Esquire
Duane Morris, LLP
30 South 17th Street
Philadelphia, PA 19103-4196

Fred S. Hodara, Esquire
Abid Qureshi, Esquire
Akin, Gump, Strauss, Hauer & Feld
590 Madison Avenue
New York, New York 10022

Scott L. Alberino, Esquire
Akin, Gump, Strauss, Hauer & Feld
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036

Counsel for the Informal Committee
of First Lien Lenders

Date: January 18, 2007

Linda Dakin-Grim, Esquire
Gregory A. Bray, Esquire
Thomas R. Kreller, Esquire
Jason B. Baim, Esquire
Milbank, Tweed, Hadley & McCoy
601 South Figueroa Street,
Los Angeles, CA 90017

Counsel for UBS AG
Stamford Branch

## Table of Contents

**Preliminary Statement** ................................... 1

**Jurisdiction & Venue** ................................... 4

**Factual and Procedural Background** ...................... 4

I.    **Introduction** ................................... 4

      A.   General Background ...................... 4
      B.   Nellson's Business ...................... 6
      C.   Capital Structure ...................... 7
      D.   Debtors' Management and Board
           of Directors ........................... 9

II.   **Evolution of Nellson's May 2006 Long Range Plan**  12

      A.   The February 2005 LRP ................... 12
      B.   The November 2005 LRP ................... 13
      C.   The December 2005 LRP ................... 20
      D.   Fremont Decides Not to Infuse
           Additional Capital ..................... 21
      E.   Fremont's "Alternative Plan Parameters" .. 23
      F.   The March 2006 Board Meeting ............ 25
      G.   The May 2006 LRP ........................ 30
      H.   Seneca Financial's Initial and Revised
           DCF Valuations ......................... 43
      I.   Recent Performance Demonstrates the
           May 2006 LRP is Unrealistic ............ 46

III.  **The Valuation Opinions** ...................... 47

IV.   **The Valuation Methodologies** ................. 49

      A.   The DCF Methodology ..................... 49
           (i)  Unlevered Projected Free Cash Flow .. 50
           (ii) The Terminal Value ................. 51
      B.   Comparable Companies Analysis ........... 51
      C.   Comparable Transactions Analysis ........ 52

V.    **Application of the Valuation Methodologies
      by the Three Experts** ......................... 53

**Determination of the Debtors' Enterprise Value** ........... 54

I.    **Introduction** .................................... 54

II.   **The Expert Opinions** ............................ 57
      A.    Chanin ..................................... 57
      B.    FTI ........................................ 58
      C.    Houlihan ................................... 59

III.  **Adjustments to the Expert Opinions** ............. 61
      A.    Chanin ..................................... 62
            (i)   DCF Analysis ......................... 63
                  (a)   Chanin's Separate Consideration
                        of the Riskier "Growth Ideas" ... 64
                  (b)   Chanin's Application of an
                        Emergence Risk Premium .......... 67
                  (c)   Chanin's Selection of Multiple
                        for Its Terminal Value .......... 70
            (ii)  Comparable Companies Analysis ........ 72
                  (a)   Chanin's Use of Revenues
                        in Its Comparable Companies
                        Analysis ....................... 72
                  (b)   Chanin's Selection of EBITDA
                        Multiple in Its Comparable
                        Companies Analysis ............. 74
            (iii) Comparable Transactions Analysis ..... 76
            (iv)  The Debtors' Non-Operating Assets .... 80
            (v)   Conclusion ........................... 83
      B.    FTI ........................................ 84
            (i)   DCF Analysis ......................... 85
                  (a)   FTI's Application of a
                        Company Specific Risk Premium ... 85
                  (b)   FTI's Exclusion of Any Value
                        to the Debtors'Non-Operating
                        Assets in Its DCF Analysis ...... 87
            (ii)  Comparable Companies Analysis ........ 88
                  (a)   FTI's Use of Revenues and
                        EBIT in Its Comparable Companies
                        Analysis ....................... 88
                  (b)   FTI's Selection of EBITDA
                        Multiple in Its Comparable
                        Companies Analysis ............. 90
            (iii) Comparable Transactions Analysis ..... 91
            (iv)  The Debtors' Non-Operating Assets .... 91
            (v)   Conclusion ........................... 92

    C.   Houlihan ................................. 93
         (i)   DCF Analysis ........................ 93
               (a)   Houlihan's Calculation of a
                     Size Risk Premium .............. 94
               (b)   Houlihan's Selection of a
                     Multiple for Its Terminal Value . 95
         (ii)  Comparable Companies Analysis ........ 96
               (a)   Houlihan's Use of Revenues
                     in Its Comparable Companies
                     Analysis ....................... 97
               (b)   Houlihan's Selection of
                     Multiples in Its Comparable
                     Companies Analysis ............. 97
         (iii) Comparable Transactions Analysis ..... 98
         (iv)  The Debtors' Non-Operating Assets .... 100
         (v)   Conclusion ........................... 101
    D.   Conclusion ............................... 101

IV.  **Weighing the Expert Opinions** ................... 102
    A.   Chanin ................................... 103
    B.   FTI ...................................... 104
    C.   Houlihan ................................. 105
    D.   Conclusion ............................... 106

V.   **Compensating For the May 2006 LRP and the
     Debtors' Performance Since June 2006** ........... 107

**Conclusion** .............................................. 109

v

SONTCHI, J. *Christopher S Sontchi*

From September through December 2006, the Court devoted 23 trial days to determine the enterprise value of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Nellson").  In addition to the Debtors, the principal parties involved in the litigation were: (a) UBS AG, Stamford Branch, as administrative agent for various lenders ("UBS"); (b) the Ad Hoc Committee of First Lien Lenders (the "Informal Committee"); and © the Official Committee of Unsecured Creditors (the "Official Committee").  UBS, the Informal Committee and the Official Committee are collectively referred to herein as the "Creditor Parties."  The Court has been presented with an extensive evidentiary record.  The Court has considered the evidence made a part of the record in this contested matter and hereby makes its findings of fact and conclusions of law.

The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.

## PRELIMINARY STATEMENT

1. The task before the Court is to determine the Debtors' enterprise value.  Generally speaking, in order to accomplish that

1

task the Court would consider the opinions of the competent experts. There would be few, if any, factual disputes to be resolved. That is not the case here.

2. Each of the three experts in this case relied on the Debtors' May 2006 long range business plan ("May 2006 LRP") in reaching a conclusion as to the Debtors' enterprise value. The evidence at trial, however, overwhelmingly established that the May 2006 LRP was not management's best and most honest thinking about the Debtors' financial future but rather was manipulated at the direction of and in cooperation with the Debtors' controlling shareholder to bolster the perceived value of the Debtors' business solely for purposes of this litigation. Moreover, the evidence established that the Debtors' business has not stabilized but is continuing the deterioration that began in 2004.

3. As a direct result of the fact that the experts' conclusions as to enterprise value are based upon the unrealistic May 2006 LRP, all of the experts have necessarily arrived at concluded enterprise values for the Debtors that are themselves somewhat unrealistic. This effect was succinctly described by one of the experts: "garbage in . . . garbage out."

4. This creates a conundrum for the Court. How does the Court rely on the expert testimony of the Creditor Parties that has been partially compromised by the actions of Debtors' management and its

2

controlling shareholder?  Does the Court exclude those portions of the expert reports based upon the May 2006 LRP, most notably the discounted cash flow analyses?  Does the Court continue the already lengthy and expensive trial to allow for the submission of revised reports by the experts?

5. While there are adjustments that must be made to each of the expert reports to correct errors, each of the experts applied usual and customary valuation methodologies to reach their conclusions as to the enterprise value of the Debtors.  The primary source of error is not the experts themselves *but the deliberately inaccurate information provided by the Debtors upon which the experts justly relied*.  Thus, to determine the Debtors' enterprise value the Court will rely on the expert opinions as submitted by the Creditor Parties with an *ex post* adjustment to their conclusion to compensate for the evidence presented at trial showing the May 2006 LRP to have been manipulated and the Company's continuing poor performance.  Any other approach would serve to reward the very persons who have created the conundrum (management and the controlling shareholder) at the expense of the creditors.

6. Specifically, the Court will determine the Debtors' enterprise value by (i) accepting the opinions of the three experts as to the Debtors' enterprise value; (ii) making adjustments to those opinions to correct for certain errors or inconsistences;

3

(iii) weighing the three expert opinions (as adjusted) based upon the credibility of each expert's opinion and testimony; and (iv) adjusting the weighted average of the experts' opinions to compensate for the May 2006 LRP and the Debtors' continuing poor performance since June 2006. After applying that approach, as set forth in detail below, the Court concludes that, as of December 31, 2006, the enterprise value of the Debtors is $320 million.

**JURISDICTION AND VENUE**

7.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

8.    Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

9.    The statutory predicate for the relief sought is section 506(a) of the Bankruptcy Code.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.    Introduction**

**A.    General Background**

10.    On January 28, 2006 (the "Petition Date"), the Debtors commenced these bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

11. The Debtors continue to operate their business and manage their affairs as debtors-in-possession, pursuant to sections

4

1107(a) and 1108 of the Bankruptcy Code. No trustee has been appointed in any of the Debtors' chapter 11 cases.

12. On February 9, 2006, the Office of the United States Trustee appointed the Official Committee to represent the interests of unsecured creditors in these cases.

13. On April 28, 2006, the Debtors commenced this contested matter by filing the *Motion of Debtors to Determine: (1) Enterprise Value of Debtors, and (2) Secured Claims of Prepetition Secured Lenders Pursuant to Section 506(a) of the Bankruptcy Code; Notice of Status Conference and Request that Court Enter Proposed Scheduling and Procedures Order in Respect Thereon (Docket No. 333).* This motion is the mechanism through which the Debtors seek the Court to determine the Debtors' enterprise value.

14. On May 26, 2006, the Court entered its *Revised Order Establishing Dates Regarding Valuation Hearing Related to the Debtors' Enterprise Value Pursuant to Bankruptcy Code Section 506(a)(Docket No. 383)* (the "Valuation Protocol"). Pursuant to the Valuation Protocol, the parties have conducted extensive discovery, including the depositions of numerous fact and expert witnesses. The Valuation Protocol established that the sole issue for consideration at the evidentiary hearing is the enterprise value of the Debtors.

15. On September 6, 2006, the Court conducted a pre-trial

conference.   On September 11, 2006, the Court entered the *Order Regarding Valuation Trial, Exhibits, Confidentiality of Documents and Testimony [Docket No. 621]*.[1]   The evidentiary hearing on the enterprise value of the Debtors took 23 trial days, beginning on September 13, 2006 and concluding on December 14, 2006.

**B.    Nellson's Business**

16.   The Debtors formulate and manufacture functional nutritional bars and powders for weight loss, sports training and wellness and medical categories. Trial Transcript ("Trial Tr.") 9/13/06 (Dias) at 179:18-180:3; UBS Ex. 209 at p. 1.

17.   Nellson operates three manufacturing facilities, which are located in Irwindale, California, Salt Lake City, Utah, and Montreal, Canada.   Nellson's headquarters and primary production facility is located in Irwindale. Trial Tr. 9/15/06 (Schouten) at 585:12-14.

18.   Nellson has its own Research and Development department that is fully dedicated, as part of its everyday ongoing business, to developing new products. Trial Tr. 9/14/06 (Dias) at 293:25-295:10, 385:8-20; Trial Tr. 9/20/06 (Cudahy) at 1182:8-1184:23.

19.   As the products which Nellson develops enjoy relatively

---

[1]The Court subsequently entered the *Order Regarding Valuation Trial: Confidentiality of Documents and Testimony [Docket No. 661]* and the *Supplemental Order Regarding Valuation Trial, Exhibits, Confidentiality of Documents and Testimony [Docket No. 795]*, both of which supplemented the previous procedural orders.

short product lives (with the market regularly demanding new and improved products) R&D is a crucial element of the maintenance of Nellson's base business. Trial Tr. 9/13/06 (Dias) at 385:8-20.

20. Nellson does not manufacture products under its own branded label, but produces products that are sold by food marketers. Trial Tr. 9/14/06 (Dias) at 313:3-314:8; 361:7-9; 362:7-19; Trial Tr. 9/27/06 (Harris) at 1581:13-18.

21. As a result of Nellson not manufacturing products under its own branded label, Nellson does not enjoy any consumer brand loyalty – the consumers who eat the products made by Nellson never know the Nellson name. Trial Tr. 9/14/06 (Dias) at 313:3-314:8; 361:7-9; 362:7-19; Trial Tr. 9/27/06 (Harris) at 1581:13-18; Trial Tr. 9/29/06 (Harris) at 1888:17-1889:1.

22. Nellson is not an exclusive manufacturer for the marketers for which it produces product. Trial Tr. 9/14/06 (Dias) at 282:7-16; Trial Tr. 9/18/06 (Schouten) at 888:3-20.

## C.   **Capital Structure**

23. Nellson is a privately held company.  Since 2002, its principal equity holder has been Fremont Investors VII, LLC. Trial Tr. 9/15/06 (Dias) at 457:13-15; Trial Tr. 9/28/06 (Harris) at 1780:2-4.

24. The Debtors (with the exception of Nellson Holdings and Nellson Intermediate) have three tranches of principal indebtedness

and trade credit consisting of:

   (a) First priority secured obligations to various lenders under the First Lien Credit Agreement;

   (b) Second priority secured obligations to various lenders under the Second Lien Credit Agreement; and

   (c) Unsecured obligations to trade vendors, lessors, Fremont and others.

UBS is agent for all lenders participating in the First Lien and Second Lien Credit Agreements (collectively, the "Lenders"). UBS Ex. 133, 207.

 25. Nellson is the borrower and the other Debtors are guarantors under both Credit Agreements.  The Debtors' obligations under the Credit Agreements are secured by first and second liens, respectively, on substantially all of the Debtors' assets.  Nellson Intermediate Holdings also has pledged the stock of Nellson to further secure the obligations under the Credit Agreements. Trial Tr. 9/21/06 (Donnelly) at 1367:19-1368:1; UBS Ex. 133, 207, 507, 508, 509.

 26. As of the Petition Date, the Debtors' outstanding principal obligations under the First Lien Credit Agreement and the Second Lien Credit Agreement totaled approximately $255 million and $75 million, respectively.  As of December 31, 2006, the Lenders will be owed, approximately $355.06 million in the aggregate,

inclusive of estimated fees, charges, and interest (including default interest). Trial Tr. 9/21/06 (Donnelly) at 1367:22-1368:1; Trial Tr. 10/05/06 (Donnelly) at 2203:21-24; UBS Ex. 507, 508, 509.

27. Unsecured debt is estimated by the Debtors to total approximately $5.8 million. *Joint Pretrial Memorandum at ¶9.*

## D.  **Debtors' Management and Board of Directors**

28. Fremont acquired Nellson in late 2002.  The First Lien Credit Agreement facilitated this acquisition. Trial Tr. 10/06/06 (Lenihan) at 2567:11-2568:9; Trial Tr. 10/10/06 (Jaunich) at 2672:9-12.

29. In February 2004, Nellson borrowed an additional $100 million and paid a dividend to Fremont in excess of $55 million. Trial Tr. 9/21/06 (Donnelly) at 1378:24-1379:4; 10/06/06 (Lenihan) at 2569:20-2572:25; Trial Tr. 10/10/06 (Jaunich) at 2707:22-2708:8; UBS Ex. 139, 207.

30. Subsequently, Nellson's performance deteriorated.  Trial Tr. 10/05/06 (Lenihan) at 2294:10-2299:1; Trial Tr. 10/10/06 (Jaunich) at 2685:6-2686:17; UBS Ex. 135, 170.

31. As a result of the deterioration in Nellson's business, Nellson breached the financial covenants in its loan agreements concerning its debt level and has been unable to correct its breach. Trial Tr. 10/05/06 (Lenihan) at 2297:4-20; Trial Tr. 10/10/06 (Jaunich) at 2684:21-2685:1, 2709.19-24; UBS Ex. 507, 508,

509.

32.    During 2005, the Debtors brought in new management to try to turn the company around. Trial Tr. 10/06/06 (Lenihan) at 2577:20-2578:10; UBS Ex. 135.

33.    Nellson retained Jeffrey B. Dias as interim President in January 2005.  He accepted the position on a permanent basis in April 2005. Trial Tr. 9/13/06 (Dias) at 140:1-5; Trial Tr. 10/06/06 (Lenihan) at 2579:9-2580:12.

34.    Ted Schouten was hired as a Vice President and Chief Financial Officer in May 2005. Trial Tr. 9/15/06 (Schouten) at 572:2-9.

35. Tom Jagiela was hired as Executive Vice President of Manufacturing and Operations in January 2005. Trial Tr. 9/13/06 (Dias) at 195:12-196:18; Trial Tr. 9/19/06 (Jagiela) at 971:22-972:17.

36.    Scott Sturgill, who was hired as a manager in 1998, is now the Vice President of Research and Development for Nellson. Trial Tr. 9/18/06 (Schouten) at 750:10-13.

37.    Jim Cudahy, who started in April 2004, is Vice President and General Manager of Nellson's Powder Division in Nellson's Salt Lake City facility. Trial Tr. 9/14/06 (Dias) at 406:10-15; Trial Tr. 9/20/06 (Cudahy) at 1179:18-1180:1.

38.    Nellson's Board of Directors consists of Chairman Robert

10

Jaunich and directors William Lenihan, Tom Debrowski, Doyle Waggle, Ben Muhlenkamp and Mr. Dias. UBS Ex. 5, 20, 22, 26, 149. As set forth below, Mr. Waggle is the sole independent director in connection with Fremont.

39. Mr. Jaunich is one of the three founding partners of Fremont. He obtained his directorship and the Chairman's role on Nellson's Board as a result of Fremont's equity investment in Nellson in 2002. Trial Tr. 10/05/06 (Lenihan) at 2267:23-24; Trial Tr. 10/10/06 (Jaunich) at 2670:17-2671:1.

40. Mr. Lenihan, a managing director of Fremont, also obtained his Board seat as a result of Fremont's investment in Nellson in 2002. Trial Tr. 10/05/06(Lenihan) at 2266:8-10; 2268:18-2269:2.

41. Mr. Lenihan has been deeply involved in the day-to-day management of Nellson, and in its long range planning, since Fremont acquired its equity position. Trial Tr. 10/05/06 (Lenihan) at 2268:20-22; Trial Tr. 9/14/06 (Dias) at 242:3-20; Trial Tr. 10/05/06 (Donnelly) at 2242:3-6.

42. Mr. Debrowski, a Mattel executive, was recruited by Mr. Jaunich in 2003 to sit on Nellson's Board as an independent director. Trial Tr. 10/05/06 (Lenihan) at 2315:22-2316:2; Deposition of Tom Debrowski taken August 16, 2006, and played into evidence by video at trial on October 11, 2006 ("Debrowski Designated Tr.") at 14:5-24.

43.  Mr. Debrowski is not, however, independent in connection with the matters concerning Fremont.  In 2005, Fremont made Mr. Debrowski a compensated member of one of Fremont's "Advisory Boards." Trial Tr. 10/05/06 (Lenihan) at 2316:3-2324:16; Debrowski Designated Tr. at 20.13-25.

44.  Mr. Waggle is an independent director, even though he was recruited by Mr. Jaunich. Deposition of Doyle Waggle taken August 16, 2006 and played into evidence by video at trial on October 10, 2006 ("Waggle Designated Tr."), at 10:24-13:3.

45.  Ben Muhlenkamp preceded Mr. Dias as the President and CEO of the Company. Trial Tr. 9/19/06 (Jagiela) at 1036:9-12; Trial Tr. 10/06/06 (Lenihan) at 2578:24-2579:8; UBS Ex 135.

## II.  **Evolution Of Nellson's May 2006 Long Range Plan**

### A.  **The February 2005 LRP**

46.  Nellson's first long range plan (each, a "LRP")following the covenant defaults in 2004 was created by Mr. Dias and presented to the Nellson Board shortly after Mr. Dias' arrival at Nellson in early 2005. Trial Tr. 10/5/06 (Dias) at 252:14-253:2; Trial Tr. 10/10/06 (Jaunich) at 2694:11-2702:15; UBS Ex 2.

47. The February 2005 LRP adopted the following financial goals. UBS Ex 2.

| FEB. 2005 LRP | '05 | '06 | '07 | '08 | '09 |
|---|---|---|---|---|---|
| NET SALES | | | | | |
| BASE | 300m | 340m | 350m | 380m | 425m |
| STRETCH | 320m | 360m | 375m | 410m | 460m |
| EBITDA | | | | | |
| BASE | 45m | 58m | 65m | 72m | 80m |
| STRETCH | 57m | 63m | 70m | 80m | 90m |

B.    **The November 2005 LRP**

48. By April 2005, only two months after the February 2005 LRP was finalized, Nellson was continuing to perform poorly with both its powder business and its more substantial bar business. By this time, it was clear that Nellson would never achieve any of the "base case" goals set out in the February 2005 plan, let alone its "stretch" aspirations. UBS Ex. 137.

49. In April 2005, Fremont was considering purchasing Nellson's debt. In pursuit of this option, Mr. Lenihan's conducted his own internal analysis of Nellson's value. Based on 6 x EBITDA, Mr. Lenihan calculated Nellson's total enterprise value at $257.8 million as of June 2005 and $280.9 as of December 2005. Trial Tr. 10/5/06 (Lenihan) at 2415:5-2416:5; Trial Tr. 10/10/06 (Jaunich) at 2702:16-2710:6; UBS Ex. 138 & 139.

50. In the summer of 2005, Messrs. Dias and Schouten set out

13

to create a comprehensive "bottoms up" LRP that would be thoroughly researched and vetted.  In exchange for a temporary waiver of the loan covenant breaches, Mr. Dias repeatedly committed to present such a comprehensive LRP to the Lenders by September 30, 2005, and Fremont separately committed to provide a restructuring plan to the Lenders by October 2005. Trial Tr. 10/04/06 (Donnelly) at 2109:22-2118:4; UBS Ex. 161, 164, 507.

51.  In preparing the plan, Dias and Schouten and their management team worked hard for months (from August through November 2005) to build what ultimately evolved into the November 2005 LRP.  In preparing this "bottom's up" plan, management conducted exhaustive customer research (Mr. Dias spoke with most customers), closely examined Nellson's capabilities, conducted a series of off-site planning sessions and sought and received substantial input from the management team as well as Fremont's Mr. Lenihan and Mr. Hallow. Trial Tr. 9/14/06 (Dias) at 255:16-256:7; Trial Tr. 9/18/06 (Schouten) at 723.12-725:21; Trial Tr. 9/19/06 (Jagiela) at 1035:5-1040:2, 1045:4-1068:23; Trial Tr. 9/20/06 (Cudahy) at 1200:7-1232:24; Trial Tr. 9/21/06 (Cudahy) at 1261:14-23,1263:8-13; UBS Ex. 3, 32, 33, 34, 36, 38, 41, 43, 44, 45, 48, 78, 79, 116, 117, 120, 125, 254, 257, 262, 308, 310, 311.

52.  There is no evidence to suggest that any similar diligence was pursued in arriving at the May 2006 LRP. Trial Tr.

14

9/20/06 (Cudahy) at 1225:21-1226:22; Trial Tr. 9/21/06 (Cudahy) at 1263:8-1265:1; Trial Tr. 9/19/06 (Jagiela) at 1068:24-1070:3.

53. In mid-September 2005, Mr. Dias presented to Mr. Lenihan a September 2005 LRP that included the following targets, which were more modest than those contained in the February 2005 LRP. Trial Tr. 9/18/06 (Schouten) at 738:23-739:23. UBS Ex. 36.

| SEPT. 2005 LRP | '05 | '06 | '07 | '08 | '09 | '10 |
|---|---|---|---|---|---|---|
| NET SALES | | | | | | |
| GROUND ZERO | 304m | 329m | 344m | 357m | 367m | 375m |
| BASE | 312m | 331m | 347m | 361m | 374m | 383m |
| STRETCH | 320m | 341m | 372m | 401m | 439m | 483m |
| EBITDA | | | | | | |
| GROUND ZERO | 47m | 42m | 46m | 47m | 47m | 46m |
| BASE | 47m | 48m | 52m | 54m | 58m | 59m |
| STRETCH | 51m | 50m | 58m | 65m | 74m | 84m |

54. In presenting the September 2005 LRP to Mr. Lenihan, Mr. Dias stated that "ground zero" meant "a bare-bones effort that holds the status quo. Nellson loses ground but holds the EBITDA. It's a low-business-risk scenario from an operating view." Mr. Dias further explained that "Base Plan" meant "put emphasis on margin building. We exclude aspects that involve breakthrough growth or require restructuring to boost operating margin." Finally, Mr. Dias stated "Stretch is where our heart is. This is a forceful effort which would require investment for restructuring.

15

There is a major push for growth, to get a new business thrust in international business. The Long Range Strategy/Plan is aimed at getting the Stretch Plan." UBS Ex. 36.

55. Mr. Lenihan was displeased with management's approach to its September 2005 LRP and, consequently, directed Mr. Dias and Mr. Schouten to abandon their September 2005 LRP and start fresh using Fremont's business model. Trial Tr. 9/18/06 (Schouten) at 743:1-745:6 & 753:8-11; Trial Tr. 10/05/06 (Lenihan) at 2350:20-2355:1; UBS Ex. 260, 39.

56. In discussions with UBS, Mr. Lenihan repeatedly had assured UBS that the plan to be provided would provide for EBITDA in excess of $60 million per year, and the September 2005 LRP fell far short of those assurances. Trial Tr. 10/4/06 (Donnelly) at 2101:1-14, 2116:1-6, 2118:16-2120:2 & 2094:20-2095:7; Trial Tr. 10/05/06 (Lenihan) at 2350:20-2355:1; UBS Ex. 260.

57. Accordingly, Mr. Lenihan had Mr. Dias stall, by informing the Lenders in writing that Nellson would not meet its commitment to provide a long range plan by September 30, 2005. Mr. Dias blamed the failure to meet his commitment on the need for more thorough analysis. UBS Ex. 162, 165, 508, 509.

58. Fremont failed to provide its promised restructuring proposal to the Lenders in October 2005. Trial Tr. 10/04/06 (Donnelly) at 2117:23-2118:4; UBS Ex. 507, 508, 509.

16

59.    From this point forward, Fremont (*i.e.*, Messrs. Halow and Lenihan) provided substantial input into the November 2005 LRP. First, Mr. Halow and Mr. Lenihan came to Nellson and met for several hours in person with Mr. Dias and Mr. Schouten.  Following the meeting of several hours, the rest of the management team was asked to provide follow-up analyses in response to a number of items raised in the Fremont meeting.  Meanwhile, Mr. Halow of Fremont took control of the business model and began populating it with assumptions based on follow-up responses from the Nellson management team and his own analyses (offering to "walk" Mr. Dias and Mr. Schouten through the assumptions he had added). Trial Tr. 9/15/06 (Dias) at 447:19-23; Trial Tr. 9/18/06 (Schouten) at 864:1-867:14l; UBS Ex. 37-46, 48, 50-52.

60. Nellson presented what has come to be known as the "Lender version" of the November 2005 LRP (hereafter, the "November 2005 LRP") in a meeting with the Lenders on November 2, 2005. Trial Tr. 9/14/06 (Dias) at 255:16-256:10; Trial Tr. 9/15/06 (Dias) at 445:2-445:10; Trial Tr. 9/18/06 (Schouten) at 768:22-769:3; Trial Tr. 10/10 (Jaunich) at 2720:7-11; Trial Tr. 10/05/06 (Lenihan) at 2381:13-2384:4, 2396:19-2397:1; UBS Ex. 3.

61. Both Mr. Schouten and Mr. Dias acknowledged that the lender version of the November 2005 LRP was their most realistic plan for Nellson.  During the meeting at which it was presented,

17

Mr. Dias told the Lenders.

> "rather than put out here a bunch of optimism, which is less substantial and which we don't have the facts obviously for, we've built our base plan around what's a very realistic, conservative base plan that we can honestly look people in the eye and promise."

Trial Tr. 10/04/06 (Donnelly) at 2125:13-22; Trial Tr. 9/18/06 (Schouten) at 768:24-769:17; UBS Ex 303.

62.   Unbeknownst to the Lenders, this version of the November LRP had been "significantly filtered" by Fremont, and Mr. Dias and Mr. Schouten had been schooled by Fremont on how to "preempt" controversial topics in discussions with the Lenders such as Nellson's valuation or an appropriate level of debt for Nellson. UBS Ex. 50, 51; Trial Tr. 10/05/06 (Lenihan) at 2370:15-2377:5.

63.   The November 2005 LRP presented to the Lenders was devoid of the "ground zero" or "stretch" concepts that appeared in the September version.  Instead, it included a single set of goals for Net Sales and EBITDA that in some cases were higher than the September 2005 base case and in some cases lower.  In every case, the numbers were materially lower than the February 2005 base version of the LRP (and drastically lower than the stretch):

18

| NOV. 2005 LRP | '05 | '06 | '07 | '08 | '09 | '10 |
|---|---|---|---|---|---|---|
| **NET SALES** | 300.4m | 317.1m | 334.1m | 345.4m | 365.1m | 381.3m |
| FEB. 2005(BASE) | 300m | 340m | 350m | 380m | 425m | |
| VARIANCE FROM 2/05 | (.4) | (22.9) | (15.9) | (34.6) | (59.9) | |
| **EBITDA** | 39.1m | 45.9m | 52.2m | 53.8m | 57.0m | |
| FEB.2006 (BASE) | 45m | 58m | 65m | 72m | 80m | |
| VARIANCE FROM 2/05 | (5.9) | (12.1) | (12.8) | (18.2) | (23) | |

Trial Tr. 10/05/06 (Lenihan) at 2406:6-18; UBS Ex. 3.

64. Although not disclosed to the Lenders, there actually existed two other "unfiltered" versions of the November 2005 LRP – one presented to Fremont's Board of Directors and one presented to Nellson's Board. Trial Tr. 9/14/06 (Dias) at 392:20-394:1; Trial Tr. 9/18/06 (Schouten) at 773:11-774:19, 781:5-21; Trial Tr. 9/19/06 (Jagiela) at 1067:15-19; Trial Tr. 10/05/06(Lenihan) at 2399:9-17, 2400:20-2401:10; UBS Ex. 53, 55 & 4.

65. Mr. Dias and Mr. Schouten put together this alternative version of the November 2005 LRP for presentation to the Fremont Board of Directors at the specific request of Mr. Lenihan for the purpose of soliciting a cash infusion into Nellson from Fremont. Trial Tr. 9/14/06 (Dias) 256:18-257:9; Trial Tr. 9/18/06 (Schouten) at 773:11-774:19.

66. The version of the November 2005 LRP presented to Fremont included a "stretch plan," the achievement of which, according to

19

Mr. Schouten, would require "breakthrough growth."  And it also included the fact that Nellson had already learned it would lose a major customer.  The loss of this customer was not disclosed to the lenders until December 2005. Trial Tr. 10/05/06 (Lenihan) at 2390:4-2392:3, 2406:6-18; Trial Tr. 10/04/06 (Donnelly) at 2127:11-17; Trial Tr. 9/18/06 Schouten) at 738:23-744:22; UBS Ex. 3, 4, 53, 57,267.[2]

C.    **The December 2005 LRP**

67.  In mid-December 2005, Nellson informed the Lenders of the loss of a major customer.  At that time, Nellson provided the Lenders with a further material downward revision to is November 2005 LRP – the December 2005 LRP – which reflected the impending loss of a customer and the acknowledged effects of further severe price compression on Nellson and the industry as a whole.  In the December 2005 LRP, Nellson projected the following:

---

[2]Pursuant to the *Order Regarding Confidentiality of Exhibits and Valuation Trial Testimony (Docket No. 879)* (the "Confidentiality Order"), the identity of this customer is not set forth herein.

20

| DEC. 2005 LRP | '05 | '06 | '07 | '08 | '09 | '10 |
|---|---|---|---|---|---|---|
| **NET SALES** | 300.4 | 316.8 | 320.7 | 319.9 | 338.0 | |
| NOV. 2005 LRP | 300.4 | 317.1 | 334.1 | 345.4 | 365.1 | 381.3 |
| VARIANCE FROM 11/05 | N/A | (.3) | (13.4) | (25.5) | (27.1) | (28.7) |
| **EBITDA** | 39.1 | 45.6 | 46.9 | 44.5 | 47.2 | 49.8 |
| NOV. 2005 LRP | 39.1 | 45.9 | 52.2 | 53.8 | 57.0 | 60.0 |
| VARIANCE FROM 11/05 | N/A | (.3) | (5.3) | (9.3) | (9.8) | (10.2) |

Trial Tr. 9/15/06 (Dias) at 463:7-465:1; Trial Tr. 9/15/06 (Schouten) at 629:2-11; Trial Tr. 9/18/06 (Schouten) at 784:17-785:12, 901:17-902:2; Trial Tr. 4/10/06 (Donnelly) at 2131:7-2132:11; UBS Ex. 8, 57, 167.

D. **Fremont Decides Not To Infuse Additional Capital**

68. Immediately after Fremont's Board saw the version of LRP presented to it on November 11, 2005 and so learned of the expected loss of a major customer's business, Fremont advised Nellson that it would not make any capital infusion into Nellson, notwithstanding Nellson's pitch that its "stretch plan" growth initiatives would be successful in the future. Trial Tr. 9/15/06 (Dias) at 451:2-14, 456:14-24; Trial Tr. 10/05/06 (Lenihan) at 2432:20-2433:3; Trial Tr. 9/21/06 (Donnelly) at 1429:14-1430:9;

21

Trial Tr. 4/10/06 (Donnelly) at 2127:11-22, 2134:5-14; UBS Ex. 4, 7.

69. The Lenders were advised of Fremont's decision not to make a capital infusion in Nellson in mid-December 2005, when Mr. Dias wrote to the Lenders:

> "However, due to this development (more capacity in the industry, greater customer concentration among continuing customers, changing risk profile) Fremont is now of the view that it will be unable to meet the lender required outcome of a de-leveraging event through a significant equity infusion. The most likely outcome will be a transfer of a controlling equity position to the lenders in conjunction with a conversion of debt to equity."

UBS Ex. 167.

70. After hearing of the loss of the customer and considering Fremont's options, Mr. Lenihan placed a telephone call to Mr. Donnelly, the senior banker at UBS responsible for the work-out of the loans, at his home, on Friday, December 9, 2005, to advise that Fremont recognized it had lost its equity in the Company and had decided to "arrange an orderly transfer" of Nellson to the banks. The following day, Mr. Lenihan called Mr. Donnelly again, this time with Fremont's counsel on the line with him, and retracted his concession and offer of the previous day. Trial Tr. 4/10/06 (Donnelly) at 2132:19-2137:24; *Contrast with* Trial Tr. 10/05/06 (Lenihan) at 2435:14-2438:7; UBS Ex. 167.

71.    UBS, acting at the instruction of requisite lenders under both the First Lien Credit Agreement and the Second Lien Credit Agreement, accelerated the loans on December 21, 2006. Trial Tr. 9/21/06 (Donnelly) at 1352:12-17; UBS Ex. 6, 507.

E.    **Fremont's "Alternative Plan Parameters"**

72.    Despite the fact that the December 2005 LRP was fresh and had been exhaustively researched and recently updated, Fremont sent "alternative Plan parameters" to Nellson management at some time prior a January 3, 2006. UBS Ex. 9; Trial Tr. 9/15/06 (Dias) at 470:18-473:17; Trial Tr. 10/05/06 (Lenihan) at 2440:9-2443:9.

73.    Mr. Dias initially rejected this further input from Fremont in the form of the alternative plan parameters, reasserting in to January 3, 2006 letter that, in his view, the "appropriate plan" for Nellson was the recently updated December 2005 LRP – or, as Mr. Dias described it, the November 2005 LRP presented to the Lenders as adjusted for the loss of a major customer.  In direct response to receiving these "alternative Plan parameters," growth initiatives "bridge," and "valuation model" from Fremont, Mr. Dias advised Mr. Lenihan that his plan of layering growth initiatives onto a base plan to reach his valuation goals would lead to "unrealistic" expectations for Nellson, stating that "it is not wise, from an operating point of view, to layer initiatives in a way that engenders expectations of an unrealistic future." Trial

23

Tr. 9/15/06 (Dias) at 470:18-473:17; UBS Ex. 9.

74. During early 2006, Mr. Dias wrote internal emails and memoranda to Mr. Lenihan and the Board stating that market pressures that continued during 2006 necessitated further downward revisions to the LRP (from the December 2005 LRP). UBS Ex. 9, 59, 60, 61, 64, 83 & 84; Trial Tr. 9/18/06 (Schouten) at 797:21-801:23; Trial Tr. 10/05/06 (Lenihan) at 2454:10-2463:6; Trial Tr. 10/10/06 (Jaunich) at 2756:21-2758:18.

75. In response to one of these communications, a senior executive at XRoads (Nellson's financial advisors), counseled Mr. Dias, advising him to keep views such as those expressed in his January 3 letter (UBS Ex. 9) to himself in order that the interests of equity holders could be protected by the professionals. XRoads discouraged Mr. Dias from expressing views that may have significance from a valuation perspective, or from ascribing ultimate probabilities of success to any plan. As a result, Mr. Dias took the position that he would not abandon Fremont's alternative plan parameters but neither would he endorse it. Mr. Dias determined that "he would stay out of their discussion about their own plans. I wasn't going to have an opinion or recommendation about it." UBS Ex. 192; Trial Tr. 9/15/06 (Dias) at 474:10-480:24; Trial Tr. 10/05/06 (Lenihan) at 2452:5-2454:9.

24

**F.    The March 2006 Board Meeting**

76.    In late February 2006, Mr. Dias sent the Nellson Board what he and Mr. Schouten variously referred to as management's "Proposed Plan 2:23.06," "Revised Plan 2:23.06" and "LRP." The revised plan incorporated new and further material downward revisions to the already-reduced December 2005 LRP, to reflect worsening market conditions that Mr. Dias laid out for the Board in letter of February 23, 2006 and February 27, 2006. In those letters, Mr. Dias advised the Board that he intended to submit the full "Proposed 2:23.06 Plan" (see UBS Ex. 86) for approval at the upcoming March 16, 2006 Board meeting, but he provided the Board with the following summary in his letter as a preview:

| FEB.23RD 2006 Plan | '05 ACTUAL | '06 | '07 | '08 | '09 | '10 |
|---|---|---|---|---|---|---|
| **NET SALES** | | | | | | |
| DEC. 2005 LRP | 300.4 | 316.8 | 320.7 | 319.9 | 338.0 | 352.6 |
| FEB. 23 2006 LRP | 298.8 | 310.8 | 313.2 | 308.6 | 322.3 | 332.4 |
| VARIANCE FROM 12/05 | (1.6) | (6.0) | (7.5) | (11.3) | (15.7) | (20.3) |
| **EBITDA** | | | | | | |
| DEC. 2005 LRP | 39.1 | 45.6 | 46.9 | 44.5 | 47.2 | 49.8 |
| FEB.23 2006 LRP | 40.8 | 42.5 | 43.3 | 41.4 | 43.7 | 46.2 |
| VARIANCE FROM 12/05 | 1.7 | (3.1) | (3.5) | (3.2) | (3.4) | (3.6) |

UBS Ex. 11; 12, 86, 525; Trial Tr. 9/15/06 (Dias) at 481:1-488:14.

77.  The proposed February 23, 2006 LRP (which was the last honest and realistic LRP prepared by management) was not well-received by the two Fremont board members on Nellson's Board, Messrs. Lenihan and Jaunich.  After their review of this proposed LRP, Mr. Jaunich and Mr. Lenihan (and no other Board members), caused several events to occur in early March 2006, which resulted in this freshly updated February 2006 LRP being abandoned by management in favor of creating a new business plan that would "transform" the Company's outlook by layering "transformation" or

26

"growth" ideas on top of a base business plan. UBS Ex. 11, 13, 14, 67, 86.

78.   First, in early March, Mr. Jaunich called and wrote to Mr. Dias, telling him <u>not</u> to include the Feb. 23, 2006 LRP in the materials for the March 16th Board meeting.  Mr. Jaunich told Mr. Dias that, instead, he should put off discussion of the LRP and focus instead on ideas that could "transform Nellson." UBS Ex. 13, 14, 67; Trial Tr. 9/15/06 (Dias) at 484:15-493:14; Trial Tr. 10/10/06 (Jaunich) at 2770:4-2771:10; 10/05/06 (Lenihan) at 2486:19-2487:11.

79.   At the same time, Mr. Lenihan discussed with Mr. Dias the possibility of an increased compensation package for Mr. Dias and the management team. UBS Ex. 11, 14.

80.   During this time period in late 2005 and early 2006, Mr. Lenihan also posed veiled threats to Mr. Dias by perpetually reminding Mr. Dias in their conversations that Mr. Dias served at the pleasure of the board, which in turn served at the pleasure of the shareholders.  Mr. Dias told Mr. Donnelly of UBS and Mr. Eric Carlson of UBS' financial advisor, Imperial Capital, on several occasions that he felt his job was in jeopardy if he did not comply with Fremont's wishes. Trial Tr. 9/14/06 (Dias) at 247:12-248:5; Trial Tr. 9/21/06 (Donnelly) at 1355:3-8, 1356:3-16, 1410:5-1413:2; Trial Tr. 10/05/06 (Donnelly) at 2252:10-2253:5; Trial Tr. 9/18/06

(Schouten) at 680:13-681:23; Trial Tr. 9/19/06 (Schouten) at 944:18-945:3.

81. At this same time in early March 2006, Fremont and Fremont's counsel spearheaded the screening of potential valuation experts. Both Fremont and Debtors' counsel contacted Seneca Financial about serving as a valuation expert (Seneca Financial was ultimately retained by the Debtors). Mr. Harris of Seneca Financial was sent a detailed list of questions for his interview with Mr. Lenihan, Mr. Dias, other directors, and Debtors' counsel, with the goal of pre-determining, before even being hired, what valuation methodologies Mr. Harris would use and whether he would apply any specific risk premiums. UBS Ex. 292.

82. On March 2, 2006, in advance of this interview, Fremont's James Halow caused Debtors' counsel to send Mr. Harris a package containing the December 2005 LRP and certain values attributable to growth initiatives to be layered onto the LRP. It is clear that Mr. Halow caused this to be sent to Mr. Harris (via Debtors' counsel) because he sent the same attachment with the growth initiatives *on the same day* to Mr. Dias and Mr. Harris, with the note that these initiatives were for the purpose of being layered onto the December 2005 LRP. UBS Ex. 293, 272.

83. Fremont's outside counsel also participated in the email exchanges by which Mr. Harris was provided with the framework for

28

the new LRP.  UBS Ex. 292, 293.

84. On the same day that Mr. Jaunich directed Mr. Dias to discard his February 23, 2006 LRP and focus on "transforming" the new business plan, Mr. Harris advised Fremont's outside counsel by email that, after having "mulled over" the issues they had privately discussed in the preceding days, Mr. Harris had figured out a way to "assist" Fremont (*not* Nellson) in the valuation process.  UBS Ex. 274, 276, 13, 67.

85. Soon after, and following Mr. Jaunich's instruction, Mr. Dias capitulated to Fremont and sent the Board a re-worked agenda for the March 16 Board meeting that, according to Mr. Dias' email, "cut out 99% of the 'Long-Range' financial tweaking," and instead focused the presentation on "transformation/new ideas" for the Company. UBS Ex. 67; Trial Tr. 9/15/06 (Dias) at 488:19-493:14; Trial Tr. 10/10/06 (Jaunich) at 2770:13-2771:10.  This was a crucial moment for the Debtors.

86.  Rather than present his new downwardly revised February 23 LRP, Mr. Dias instead prepared and circulated a Board pack that asked "How might Nellson be transformed?," and listed various "transformation options" with the lead-in that, "We have known that 'transformation' might be essential for Nellson." UBS Ex. 14.

87. A resolution concerning a compensation increase for the senior management team at Nellson, including Mr. Dias and Mr.

29

Schouten, was also tabled and approved at this Board meeting. UBS Ex. 14; Trial Tr. 10/05/06 (Lenihan) 2490:18-2495:14.

## G.  **The May 2006 LRP**

88. Having capitulated to Fremont's demands, Mr. Dias and Mr. Schouten continued to work with Mr. Lenihan and Mr. Halow over the next two months to develop a new long-range plan which, as desired by Fremont's Mr. Lenihan, Mr. Halow and Mr. Jaunich, would layer "transformation" concepts onto a base business plan. UBS Ex. 13, 14, 67, 89, 100 at p. D010366, 272, 503; 9/18/06 (Schouten) at 864:1-867:14; Trial Tr. 9/18/06 (Schouten) at 729:2-11, 731:20-732:2; Trial Tr. 9/15 (Dias) at 447:19-23.

89. Despite Mr. Dias' previous warnings as to the dangers of "layer(ing) on initiatives in a way that engenders expectations of an unrealistic future", the May 2006 LRP was prepared in precisely this fashion.  And unlike earlier "bottoms up" LRPs which had been comprehensively researched and vetted with exhaustive customer research and planning sessions, the May 2006 LRP was hurriedly prepared without the same level of customer or operational analysis as occurred for earlier plans.  In fact, Mr. Schouten admittedly did not even begin work on the May 2006 LRP until mid-April 2006. And, as of mid-April, mere weeks before the May 2006 LRP was finalized, Mr. Schouten and Mr. Dias still had not decided which "growth ideas" to layer onto the base business plan.  As Mr.

Schouten explained in an email, having identified a base plan model, the "next step is to create a simple layering in of growth initiatives (this is easy except *we have to decide which ones, how much and when*)." Trial Tr. 9/18/06 (Schouten) at 841:22-842:19; Trial Tr. 9/15/06 (Schouten) at 615:12-619:21; Trial Tr. 9/21/06 (Cudahy) at 1263:8-1265:1; UBS Ex. 90.

90.    Fremont (particularly Mr. Lenihan and Mr. Halow) was actively and heavily involved in the preparation of the May 2006 LRP in that Fremont dictated the overall framework of the new plan (i.e., a base plan with growth initiatives layered on), and had extensive meetings and conversations with Mr. Dias and Mr. Schouten in regard to the May 2006 LRP. See UBS Ex. 22, 66, 100, 154, 172, 173, 244, 245, 272, 293; Trial Tr. 9/18/06 (Schouten) at 859:7-860:18; 863:21-867:8; Trial Tr. 10/05/06 (Lenihan) at 2532:22-2533:20; 2536:13-2537:13; 2538:15-2540:21.

91. Ultimately, when the May 2006 LRP was provided to the experts in this case, it contained significantly higher revenue and EBITDA projections than either the December 2005 or February 2006 LRPs.  The forecasts contained in the May 2006 LRP as contrasted with those from the December 2005 LRP, are as follows:

| MAY 2006 LRP | `06 | `07 | `08 | `09 | `10 | `11 |
|---|---|---|---|---|---|---|
| **NET SALES** | | | | | | |
| MAY 2006 LRP | 314 | 333.2 | 340.5 | 374.4 | 412.9 | 432.7 |
| DEC. 2005 LRP | 316.8 | 320.7 | 319.9 | 338.0 | 332.4 | N/A |
| VARIANCE | (2.8) | 12.5 | 20.6 | 36.4 | 80.5 | N/A |
| **EBITDA** | | | | | | |
| MAY 2006 LRP | 43.2 | 45.6 | 45.8 | 51 | 58.7 | 62.1 |
| DEC. 2005 LRP` | 45.6 | 46.9 | 44.5 | 47.2 | 49.8 | N/A |
| VARIANCE | (2.4) | (1.3) | 1.3 | 3.8 | 8.9 | N/A |

UBS Ex. 503, 8 & 9.

92.   There is no evidence to support the sudden optimism of the May 2006 LRP.  Despite claims by Mr. Schouten and Mr. Dias that the long-range plan needed a "total rewrite" because of the purported "turnaround" at the Company and because the assumptions being used in previous LRP iterations were "quickly becoming old," this was not true.  In reality, the business was struggling at the time Mr. Dias and Mr. Schouten were discarding the February 23,

2006 LRP in favor of Fremont's new "stretch" plan scenario. Mr. Dias' *own internal emails and letters* reveal that, in the interim between the February 23, 2006 LRP and the May 2006 LRP, the market continued to show weakness, price compression risks continued to rise, Nellson continued to face the ever-present risk of losing customers to competitors (from their highly concentrated customer base), and even as late as May 3, 2006 (days before the May 2006 LRP was finalized) sales lagged behind what was needed for a successful year. Mr. Dias also acknowledged that the May 2006 LRP was built using the same basic categories of assumptions from prior iterations. UBS Ex. 17, 88, 89, 111; Trial Tr. 9/14 (Dias) at 240:6-13; Trial Tr. 9/15/06 (Dias) at 445:11-448:9, 507:10-509:18; Trial Tr. 9/18/06 (Schouten) at 802:4-13.

93. Mr. Dias' February 23, 2006 letter to the Board showed that management did not need a fresh look at the business or "a total rewrite" of the Plan. On the contrary, his letter shows that the February 23, 2006 LRP was exhaustively researched and up-to-date (a rigorous "bottom's up" analysis like the September, November and December 2005 LRPs before it), and that management had the utmost confidence in this plan based on a thorough understanding of the business. In this regard, Mr. Dias told the Board that:

> "Since then we have closed the year, generated
> *intense contact* with customers and suppliers,
> *negotiated pricing* and contracts with several
> mid-sized customers, gotten the initial
> *experience with BK*, and *have insight into the
> business through February* . . . . [¶]
> Obviously, the EBITDA line is not where we
> [Mr. Dias and Mr. Schouten] want it to be, *but
> it does reflect specific changes and forces we
> understand quite well.*"

UBS Ex. 11.

94. Meanwhile, as they adhered to Fremont's orders to create
a new puffed-up plan that layered growth ideas on top of the base
business, their own concerns about continued poor performance led
Messrs. Dias and Schouten to recommend *yet another* downward
revision to the budget and projections in April 2006 (just a month
before the May 2006 LRP was issued). Specifically, Mr. Dias wrote
to the Board on April 3, 2006, recommending that the Board *lower*
the 2006 budget goals that had been discussed at the March 16th
Board meeting as a result of new customer intelligence, a "slower
market," and the "dominant risk" of price compression which "keeps
our management up at night." He wrote that approval of his higher
"stretch plan" budget, as the Board indicated at the March 16, 2006
meeting, would leave a $23 million revenue gap in the budget. Mr.
Dias proposed a base revenue goal of $305 million and EBITDA of
$41.05, with the previous goals suggested at the March 16 Board
Meeting of revenue $314 and EBITDA $43.02 being relegated to

"stretch" goals. UBS Ex. 17, 18; Trial Tr. 10/05/06 (Lenihan) at 2511:8-2521:23.

95.  Mr. Dias' recommendations were overruled by the Fremont Board representatives Messrs. Lenihan, Jaunich and Debrowski, who, through their control of the Nellson Board, imposed a higher budget of revenue $314 million and EBITDA $43.2 million on the Company over Mr. Dias' objection.  Mr. Dias was furious at the imposition of what he regarded as an unachievable budget for 2006 and, in his last act of defiance, he abstained from the vote "indicating that there is a gap of about $23 million in revenue versus what customers have currently planned." UBS Ex. 149; Trial Tr. 9/14/06 (Dias) at 499:6-500:20; Debrowski Designated Tr. at 139:6-140:14; Trial Tr. 10/05/06 (Lenihan) at 2521:2-23, 2521:24-2522:4.

96.  At Mr. Lenihan's request, Mr. Schouten's draft minutes of the meeting which recorded the reason for Mr. Dias' abstention were later amended so as to eliminate any record of Mr. Dias' views as to the unreasonableness of the budget. UBS Ex 109, 19, 149; Trial Tr. 10/05/06 (Lenihan) at 2524:23-2526:17.

97.  None of the remaining experts in this case (all of whom used the 2006 budget numbers in their valuation analyses) were ever told that the 2006 budget was not management's best recommendation but instead had been imposed on them by the Board.  Trial Tr. 10/12/06 (Belinsky) at 2974:23-2975:2; Trial Tr. 11/09/06 (Braun

35

Testimony) at 3410:23-3411:21, 3420:17-23; Trial Tr. 11/17/06 (Hardie) at 3859:19-3860:15.[3]

98.   The significant increase in the projections for Nellson's earning potential contained within the May 2006 LRP as compared with management's previous plans, is largely based on the "transformational ideas" resurrected at Mr. Jaunich's direction for the March 16th Board meeting and layered onto the base business. Mr. Schouten conceded that this structure of the May 2006 LRP was precisely the same framework as the "stretch" plans he had presented to Fremont in September 2005 and November 2005. UBS Ex. 8, 9, 14 & 503; Trial Tr. 9/18/06 (Schouten) 726:23-729:1; 775:8-779:11.

99.   The May 2006 LRP drives revenue above and beyond the base business revenue by relying on two "growth ideas" that are generally described as being (a) a new line of breakfast items, with the lead option being a powder product, and (b) qualifying a private-label in Canada. UBS Ex. 503; UBS Ex. 15 at D-000362-369.[4]

100.  Neither idea has progressed beyond a conceptual stage and there are no orders for any products falling within either growth idea. Trial Tr. 9/18/06 (Schouten) 694:20-695:7; Trial Tr. 9/19/06

---

[3]The valuation report and testimony of the Debtors' expert was previously excluded by the Court as unreliable under Fed. R. Evid. 702. *See* Order of the Court dated November 29, 2006 (Docket No. 854).

[4]Certain details of the "growth ideas" are not set forth herein pursuant to the Confidentiality Order.

(Jagiela) at 1074:11-14, 1080:16-20, 1095:8-1098:3; Trial Tr. 9/20/06 (Jagiela) at 1165:22-1166:10; Trial Tr. 9/20/06 (Cudahy) at 1187:14-16, 1235:14-17, 1236:18-20, 1238:8-1240:8, 1248:10-24; Trial Tr. 9/21/06 (Cudahy) at 1317:19-24; Trial Tr. 10/06/06 (Lenihan) at 2500:8-14; Trial Tr. 10/13/06 (Belinsky) at 3230:14-3232:17.

101. No market research or customer surveys were prepared in connection with the inclusion of the "growth ideas" in the May 2006 LRP and no effort was made to determine whether any appetite for these "transformational ideas" existed in the market. Trial Tr. 9/15/06 (Dias) at 548:2-13; Trial Tr. 9/20/06 (Cudahy) at 1233:1-20, 1238:8-1240:8, 1242:8-21; Trial Tr. 9/21/06 (Cudahy) at 1252:8-1258:17.

102. As for the new powder "initiative" (growth idea #1) – of which the powder product was the lead option – neither Mr. Jagiela (head of all operations) nor Mr. Cudahy (head of the powder division and the facility where the product would be produced) were consulted on the operational aspects of this idea before its inclusion in the May 2006 LRP. In fact, neither Mr. Cudahy nor Mr. Jagiela were even aware of the idea until being surprised at the March 16 Board meeting when a prototype was brought in by the R&D department. Trial Tr. 9/19/06 (Jagiela) at 1048:11-15; Trial Tr. 9/20/06 (Cudahy) at 1233:1-6.

103. Nellson's CEO Mr. Dias told the experts that the "growth ideas" upon which substantial revenue in the new business plan are based are "*more risky*" than Nellson's base business.  The added risk is attributable to the fact that the growth ideas are still new and untried in the market, without any established sales or customers to speak of, and consumers have shown no inclination that they embrace the new ideas. Trial Tr. 9/28/06 (Harris) at 1760:14-19; Trial Tr. 10/11/06 (Belinsky) at 2915:9-20.

104.  Mr.  Dias  and  Mr.  Schouten  claimed  that  they  had discounted the revenues and margins assigned to the growth ideas in the May 2006 LRP.  Neither Mr. Dias nor Mr. Schouten could point to a single document demonstrating a so-called discount being factored into  the  assigned  revenues.   Rather,  they  assigned  revenue  and margin numbers for the growth ideas in their own minds, out of thin air,  and  then  discounted  them  in  their  own  minds,  without  input from the R&D department, head of powder division, sales department, or head of operations. Trial Tr. 9/18/06 (Schouten) at 685:3-688:6; 695:8-12;  and  Trial  Tr.  9/14/06  (Dias)  at  317:3-323:19;  381:5-385:7).

105. In addition to these risks specifically facing the growth ideas, price compression and customer concentration remain material risks to all Nellson's future forecasts. Trial Tr. 9/15/06 (Dias) at 446:4-7, 474:5-9; 496:9-498:2; UBS Ex. 9, 17, 59, 60, 61, 64,

83, 84, 167.

106. Nellson's recently successful "soup in a bucket" product is not a "growth idea."  The product does not even fit Mr. Dias' own definition of a "growth idea."  According to Mr. Dias, the base business items in the May 2006 LRP are items that require little change to the business model, and includes bars and powders with existing customers and growth from those existing customers based on conversations and input from those customers.  By contrast, Mr. Dias defined a "growth idea" as a product that applies the Company's existing skills, strengths, and capabilities but which also: (a) leads to "a change in the business model"; and (b) "requires moving beyond what the company has traditionally done in its base business." Trial Tr. 9/14/06 (Dias) at 264:23-266:13; 296:10-297:19.

107. To Mr. Schouten, a growth initiative meant to him a new product that required a new and different delivery system – for example, they have bar and powder right now, and maybe the company gets into a liquid format or something like that. Trial Tr. 9/18/06 (Schouten) 783:21-784:6.

108. Mr. Jagiela, head of Nellson's operations, admitted that the "soup in a bucket" product has caused no change to the business model, as required by Mr. Dias' definition, and that Nellson has been producing a powdered soup product for a long time as part of

39

its regular base business, with the only difference being that they are now taking the individual packets of soup and hand-packing them into "buckets" for a particular customer.  Mr. Jagiela said that "soup in a bucket" is not transformational for Nellson, but is just an extension of Nellson's existing business.  And Mr. Schouten admitted that the product resulted from the sales force receiving a specific request from an existing customer. Tr. 9/19/06 (Jagiela) at 1095:14-1098:3; Trial Tr. 9/18/06 (Schouten) at 771:21-771:24.

109. The May 2006 LRP also includes for the first time a new revenue category called "unallocated revenue." UBS Exs. 218, 503.

110. The Board's rejection of Mr. Dias' budget recommendation at the April 7th meeting created a $23 million gap in revenue in the May 2006 LRP.  Yet, rather than reduce the revenue numbers throughout in the May 2006 LRP, Mr. Dias admittedly "invented" a new revenue category called unallocated revenue.  Mr. Schouten admitted this is revenue that is "not underpinned by any specific action plans for any specific customer."  The evidence shows that this category was created solely to preserve the higher numbers in the Plan.  In an April 17, 2006 email to Mr. Schouten, Mr. Dias explicitly states that the purpose was "to preserve the [$314 million] net sales number" in the 2006 budget.  Mr. Dias conceded that both his use of unallocated revenue and his spreading of powder sales proportionally by customer to reach the $52 million

40

projection for powder were "top-down" approaches. UBS Ex. 92, 111, 149; Trial Tr. 9/18/06 (Schouten) at 845:13-17; Trial Tr. 9/14/06 (Dias) at 268:21-270:3; Trial Tr. 9/15/06 (Dias) 528:22-530:13; 535:9-18, 539:16-543:18.

111. During the week that the May 2006 LRP was produced, Messrs. Dias and Schouten suddenly eliminated millions in projected capital expenditures in only the terminal years of the LRP without any input from Mr. Jagiela. The capital expenditure in the terminal year was vitally important to Mr. Harris' modifications to the Discounted Cash Flow analysis. This is despite the fact that, as Mr. Jagiela admitted, he is the only person at Nellson with the expertise to construct such a detailed capital plan. Not a single witness at Nellson could offer a credible explanation as to why the capital expenditures were suddenly reduced. The head of manufacturing and operations, Mr. Jagiela, who had prepared capital plans for more than 20 years, first sent his capital plan for Nellson to Mr. Schouten on October 5, 2005 for inclusion in the Nov. LRP. He stood by the same Cap Ex numbers for seven months and re-sent the same basic plan to Schouten on April 12, 2006 for inclusion in the May 2006 LRP. The last minute reduction in terminal year Cap Ex – which was initiated by Mr. Schouten and Mr. Dias – greatly assisted Mr. Harris in his valuation number that the Court has now excluded. Trial Tr. 9/19/06 (Jagiela) at 1105:1-

41

1118:14; Trial Tr. 9/18/06 (Schouten) at 860:20-864:12; UBS Ex. 24, 25, 72, 98, 100, 129, 503.

112.  The $6 million figure for Cap Ex projected in the terminal year of the May, 2006 LRP is a highly speculative and questionable number – the lowest Cap Ex figure in the Company's recent history. Trial Tr. 9/28/06 (Harris) at 1848:6-1851:21; Trial Tr. 9/29/06 (Harris) at 1933:19-1934:7; Trial Tr. 9/18/06 (Schouten) at 867:15-870:12; Trial Tr. 9/19/06 (Jagiela) at 1054:1-1055:1, 1143:1-1145:23.

113.  In the event that sales of any of Nellson's "transformational ideas" are made, there is insufficient CapEx in the May 2006 LRP to support them. UBS Ex. 283; Trial Tr. 9/28/06 (Harris) at 1799:9-12; Trial Tr. 9/18/06 (Schouten) at 870:3-880:3; Trial Tr. 10/13/06 (Belinsky) at 3241:8-3244:11.

114. This reduction in Cap Ex was instigated by Mr. Lenihan of Fremont.  Mr. Schouten and Mr. Dias met with Mr. Lenihan and Mr. Halow for hours on April 26, 2006 to discuss the new LRP.  Mr. Schouten memorialized Fremont's input from this meeting on the first page of his May 1, 2006 draft LRP.  Among Mr. Schouten's notes, which reflect the thoughts and input from Mr. Lenihan and Mr. Halow, is an item entitled "capital," which says that Nellson should "think about shoving around the mix required of base business – maybe less than $8m." *The very next draft* of the LRP

42

that was circulated by Mr. Schouten on May 9th (three days before the final LRP was issued) reduced the Cap Ex in years 2010 and 2011 from the $8 million levels in Mr. Jagiela's capital plan to $6 million. *See* UBS Ex. 100; 25; Trial Tr. 9/18/06 (Schouten) at 860:20-865:24.

115. Another manipulation occurred within days of issuing the May 2006 LRP. The Debtors suddenly added Fiscal Year 2011 to their LRP with no analysis. Fiscal Year 2011 contained higher EBITDA and net sales numbers than the terminal year of 2010 in all previous iterations of the LRP. Again, Mr. Schouten's notes of Fremont's thoughts and input from their late-April meeting indicate that it was likely Fremont that suggested the addition of FY 2011 to boost the LRP. In particular, the final notation on the first page, which Mr. Schouten conceded to be a reflection of Fremont's input and thoughts, states that "2011 needs to be higher for two reasons – one more year and if we spend higher capital need a return on the capital." UBS Ex. 95, 98, 99 & 100 at p. D-010366; Trial Tr. 9/18/06 (Schouten) at 860:20-865:24.

## H.   Seneca Financial's Initial and Revised DCF Valuations

116. On June 16, 2006, a week before all expert valuation reports were due pursuant to the valuation protocol, Mr. Harris delivered a *draft* valuation to the Nellson Board that utilized an EBITDA-only DCF analysis and did not reach Fremont's equity hurdle.

Mr. Harris' draft valuation was discussed in the course of the Nellson Board call on June 16, 2006. During the call, Mr. Lenihan had a long discussion with Mr. Harris in which he took it upon himself to educate Mr. Harris on "the cash-generative nature of Nellson and how to properly reflect that in valuation." Mr. Debrowski, a Nellson director, recalled a "lively" and "lengthy" technical discussion at the June 16th Board meeting "between Mr. Harris and Bill Lenihan regarding the methodology that Mr. Harris used to make his determinations." Mr. Harris admitted that the Board told him it was a good idea to use the "Cap Ex" methodology. UBS Ex . 77, 279; Trial Tr. 9/28/06 (Harris) 1801:3-11, 1807:18-19; 1812:8-1830:13; Trial Tr. 10/05/06 (Lenihan) at 2407:20- 2407:24, 2408:1-7; 2408:15-22; Trial Tr. 10/06/06 (Lenihan) at 2540:22-2541:22, 2544:7- 2546:17; Debrowski Designated Tr. at 176:13-181:3 & 181:14-183:7.

117. Following these discussions, Mr. Lenihan and Mr. Harris ironed out their disagreements over the valuation methodology to be used, and Mr. Harris came back less than a week later and provided to the Board in advance of its June 21, 2006 Board meeting a new valuation report using the "less Cap Ex" approach rather than the EBITDA-only DCF approach he had used in his original draft. The new report – which was immediately approved by the Board for distribution the next day – boosted Mr. Harris' valuation beyond

Fremont's equity hurdle.  According to Mr. Debrowski, when the Board re-convened on June 21, 2006, Mr. Harris and Mr. Lenihan had obviously come to some "agreement" concerning the valuation methodology:  the two of them had "gone away and done some work together" and "whatever issues (Mr. Lenihan and Mr. Harris)had had in terms of their disagreements around the valuation methodology had been resolved."  Debrowski Designated Tr. at 178:13- 181:3 & 181:14-183:7; 185:2-10; UBS Ex. 26, Debtors' Ex. 1 & 2; Trial Tr. 9/28/06 (Harris) 1813:8-1816:11.

118. UBS Exhibit 279 is a draft valuation analysis of Nellson prepared by Seneca Financial using customary valuation practices. Though Mr. Harris denied UBS Exhibit 279 is a Seneca Financial document, the document has an identical format to several other Seneca Financial valuation analyses and on page 3 it lists several assumptions as "Seneca assumptions."  In the analysis, Seneca Financial reached a total enterprise valuation of only $271 million – far below Fremont's equity hurdle.  Moreover, when Mr. Harris's conclusions on cash ($24 million) and goodwill ($15 million) are added back into this total, Seneca Financial's concluded value using generally accepted practices is $311 million – in the same range as all of the other experts.  *Compare* UBS Ex. 279, 256, 209 (p. 62), and First Lien Holders Ex. 1.

119. **In sum, Fremont utilized its control over Nellson to**

45

manipulate both the business planning and valuation processes to come up with an artificially inflated enterprise value in order to claim some residual value for their existing equity position. There is no other credible interpretation of the evidence before the Court.

I.    **Recent Performance Demonstrates the May 2006 LRP is Unrealistic**

120.    Nellson's results since the May 2006 LRP was finalized reveal a significant decline in bar sales, which comprise approximately 70-80% of Nellson's business. UBS Ex. 153, 530, 535 & 536; Trial Tr. 9/14/06 (Dias) at 370:22-24.

121.    Nellson has already fallen substantially and irretrievably behind the early forecasts contained within the May 2006 LRP.  The sales results for Periods 7, 8, 9 along with the backlog reports for periods 10, 11 and 12 indicate that Nellson's results continue to trend downwards and that Nellson is already significantly behind plan.  This is despite the fact that the forecasts contained within the early years of the May 2006 LRP are by far the most conservative of the projections contained within the May LRP. UBS Ex. 153, 530, 535 & 536.

122. Within only three months of approving the 2006 budget, the company was already $14 million below budget in net sales and $22 million behind within four months, with the outlook worsening

46

for the remainder of the year.  It appears that as of Period 10, Nellson will be approximately $30 million behind the budget established for 2006 just a few months ago.  As of Period 10, Nellson will also be more than $3 million behind in budgeted EBITDA for 2006. UBS Ex. 153, 530, 535 & 536.

## III.  **The Valuation Opinions**

123.  Three experts have had their valuation reports accepted as reliable by the Court and so admitted into evidence: Richard S. Braun of FTI Consulting, Inc. ("FTI") on behalf of the Official Committee; William H. Hardie of Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan") on behalf of the Informal Committee; and Russell A. Belinsky of Chanin Capital Partners ("Chanin") on behalf of UBS. UBS Ex 215, 294, 502, 505, 506, 512, 513, 516, 517 & 518.

124.  The valuation report of Mr. James Harris, the Debtors' expert, has been excluded by the Court as unreliable under Rule 702 of the Federal Rules of Evidence.

125.  Three reputable independent experts, Messrs. Belinsky, Braun and Hardie, have applied usual and customary valuation methodologies to reach their conclusions as to the enterprise value of Nellson.  Each relied upon well regarded sources such as SBBI Valuations published by Ibbotson & Associates and Mergerstat in the conduct of their research. UBS Ex. 501, 502; 512, 517; Trial Tr. 10/11/06 (Belinsky) at 2887:9-2906:4; 2927:3-2928:2; Trial Tr.

11/8/06 (Braun) at 3262:9-3294:12; Trial Tr. 11/16/06 (Hardie) at 3650:23-3660:2; 3680:18-23.

126. Although Chanin, Houlihan and FTI have differences among them, all of them used generally accepted valuation methodologies to arrive at results that are within approximately 10% of each other. UBS Ex. 502 at p. 5, 512 at pp. 3, 7, 517 at pp. 3, 6.

127. Messrs. Belinsky, Braun and Hardie all reach the same basic conclusion – that the enterprise value of Nellson is *not* sufficient to leave any value for Fremont. UBS Ex. 502 at p. 5, 512 at p. 7, 517 at p. 6.

128. The aggregate spread between the high and low valuations reached by these experts as of the date of their initial reports is summarized below:

| Valuation Party | Valuation Range ($000,000) | Median Value ($000,000) |
|---|---|---|
| FTI – – The Committee's expert | – – | $349 |
| Houlihan – – The Informal Committee's expert | $301–$343 | $322 |
| Chanin – – UBS' expert | $296.1 –$333.0 | $314.4 |

*See* UBS Ex. 502 at p. 5, 512 at p. 7, 517 at p. 6.

## IV. The Valuation Methodologies

129. Messrs. Belinsky, Braun and Hardie all utilized the three customary valuation methodologies: the Comparable Companies analysis, the Comparable Transactions analysis and the Discounted Cash Flow analysis ("DCF"). UBS Ex. 502 at p. 5, 512 at p. 3, 517 at p. 3.

130. It is standard valuation practice to calculate value using all three methodologies, and then reach an ultimate opinion by assigning a weight to the value associated with each method, based on the methods' suitability to the case at hand. Trial Tr. 10/11/06 (Belinsky) at 2928:11-2932:3; 2937:9-2937:24; Trial Tr. 11/08/06 (Braun) at 3334:23-3335:15; Trial Tr. 11/16/06 (Hardie) at 3680:18-24, 3697:22-3698:14; UBS Ex. 502 at pp. 5, 21-22, 517 at p:6.

## A.    The DCF Methodology

131. Under the DCF analysis, enterprise value is calculated as the sum of two parts.  The first part is the present value of the company's unlevered projected free cash flow.  The second part of enterprise value in a DCF analysis is the company's "terminal value," which represents the remaining value of the company after the period during which the unlevered free cash flow was projected. Trial Tr. 10/11/06 (Belinsky) at 2928:11-2932:3; Trial Tr. 11/16/06 (Hardie) at 3736:20-3737:22; UBS Ex. 517 at p:15.

**(i) Unlevered Projected Free Cash Flow**

132. Unlevered free cash flow represents the cash flow that a company is projected to generate during a specified period of time if it were to have no debt in its capital structure. To calculate the present value of this cash flow, the expert discounts the unlevered free cash flow by the weighted average cost of capital, or "WACC." Trial Tr. 10/11/06 (Belinsky) at 2931:2-2932:3; 10/12/06 (Belinsky) at 3002:23-3004:8.

133. The following WACC's were adopted by the respective experts: FTI 15%, Houlihan 14.9%, and Chanin 14%. UBS Ex. 502, 505, 512, 517, 518; Trial Tr. 10/12/06 (Belinsky) at 3002:23-3004:8; Trial Tr. 11/08/06 (Braun) at 3368:4 – 3370:19; Trial Tr. 11/16/06 (Hardie) at 3738:22-23.

134. Fremont used a 15% discount rate for Nellson in various of their own internal analysis, and Mr. Harris used a discount rate of 15.1% in his draft DCF analysis for Nellson. UBS Ex. 154, 279; Trial Tr. 9/18/06 (Schouten) at 818:12-819:24.

135. Nellson used a 20% rate in an April 2006 iteration of the business plan, which Mr. Schouten deemed to be "reasonable." Trial Tr. 9/18/16 (Schouten) at 855:20-858:13, UBS Ex. 23 at D-009220.

136. One element in determining the WACC is the selection of an appropriate company-specific risk premium. All the experts included such a premium, which is derived from a source book for

50

such rates called, "Stocks, Bonds, Bills and Inflation, Valuation Edition Yearbook," published by Ibbotson Associates (hereinafter, "Ibbotson").  Ibbotson assigns a certain risk premium to a company depending on its equity market capitalization. Trial Tr. 9/27/06 (Harris) at 1595:21-1598:23; Trial Tr. 10/12/06 (Belinsky) at 3005:14-3006:10; Trial Tr. 11/08/06 (Braun) at 3300:1-15; Trial Tr. 11/16/06 (Hardie) at 3745:22-3746:2; UBS Ex. 504, 502 at p. 5, 512 at p. 7, 517 at p. 6.

### (ii) The Terminal Value

137.   A company's "terminal value" represents the remaining value of the company after the period during which the unlevered free cash flow was projected.  The terminal value may be calculated either by assuming a perpetual growth rate of terminal unlevered free cash flow, or as a multiple of the company's terminal EBITDA (or other appropriate metric). Trial Tr. 10/11/06 (Belinsky) at 2931:2-2932:3; UBS Ex. 517 at p. 15.

### B.   Comparable Companies Analysis

138. Under the Comparable Companies analysis, value is calculated by examining the trading ranges of comparable priced publicly traded companies.  Public companies are used to determine the value of the subject privately held company because they are the only ones for which economic data (stock value, revenue, EBITDA and EBIT) is publicly available.  Trading ranges are viewed as a

multiple of a performance metric, generally revenues, EBITDA or EBIT. The multiples are then applied to the performance metric of the company being evaluated, in order to determine its enterprise value. Trial Tr. 10/11/06 (Belinsky) at 2928:11-2932:3; UBS Ex. 517 at 13.

139. The more similar the guideline companies are, the more supportable the use of the Comparable Companies method. Use of companies that are clearly not comparable will lead to unsupportable conclusions. Trial Tr. 9/27/06 (Harris) 1573:18-24; Trial Tr. 9/28/06 (Harris) 1703:17-1704:24; Trial Tr. 11/16/06 (Hardie) at 3696:9:9-12. 3700:13-17.

## C.    **Comparable Transactions Analysis**

140. Under the Comparable Transactions analysis, value is determined by examining the consideration paid to acquire an entity through a publicly reported merger or acquisition. Like the Comparable Companies analysis, the purchase price is viewed as a multiple of an appropriate earning measure (revenue, EBITDA or EBIT). Enterprise value is calculated by applying the resulting multiple to the EBITDA of the company being evaluated. Trial Tr. 10/11/06 (Belinsky) at 2928:11-2932:3; UBS Ex. 517 at p.14.

141. Like the Comparable Companies analysis, the more similar the target company is to Nellson, the more confidence one can place in the valuation indication. Trial Tr. 10/12/06 (Belinsky) at

2959:15-2960:2; Trial Tr. 11/16/06 (Hardie) at 3713:13-3714:3.

**V.  Application of the Valuation Methodologies by the Three Experts**

142. The three experts – Chanin, Houlihan, and FTI – have differences and criticisms of each other's reports.  Nonetheless, all of them used customary and generally accepted valuation methodologies, applied in a disciplined manner, to arrive at results (in June 2006) that are within approximately 10% of each other.  Specifically, Chanin's median value was $314.4 million; Houlihan's was $322 million; and FTI's was $349 million. UBS Ex. 502, 512, 517.

143. Those results, however, were only as of June 2006, and did not account for either (a) the evidence presented at trial (as set forth in detail above) showing the May 2006 LRP to have been manipulated at Fremont's direction; or (b) the Debtors' continuing poor performance since June 2006.  As noted from the outset, the task for the experts here was to value the Company based on the May 2006 LRP, accepted as management's best and most honest thinking about the Debtors' financial future.  All three experts were left completely "in the dark" about management's true financial outlook and the manipulation of the business plan. UBS Ex. 502 at p. 3, 512 at p. 3, 517 at p. 5; Trial Tr. 10/11/06 (Belinsky) at 2927:18-2928:10, 2940:7-2941:5, 2963:7-20; Trial Tr. 11/08/06 (Braun) at 3426:4-3427:10; Trial Tr. 11/17/06 (Hardie) at 3864:11-3856:12; UBS

Ex. 153, 503, 530, 535 & 536.

144.  As a direct result of their conclusions being based upon the unrealistic May 2006 LRP, all three of these experts have necessarily arrived at concluded enterprise values for Nellson which are themselves somewhat unrealistic.  This effect was sufficiently described by Mr. Braun of FTI: "garbage in . . . garbage out." Trial Tr. 11/8/06 (Braun) at 3426:10-20.  Based on information revealed to them at trial and on the inability of Nellson to meet even the conservative targets it set itself for the present year, Messrs. Belinsky, Braun and Hardie all testified that they would now need to reduce significantly their respective valuations in order to give a valuation of Nellson which reflects the current condition of the company. Trial Tr. 10/12/06 (Belinsky) at 2975:3-12, 2977:8-2978:4, 2979:12-2980:21, 3222:17-3227:5; Trial Tr. 11/16/06 (Hardie) at 3677:9-3679:5, Trial Tr. 11/08/06 (Braun) 3439:3-3442:4; Trial Tr. 11/16/06 (Hardie) at 3755:2-3757:4; UBS Ex. 153, 530, 535 & 536.

## DETERMINATION OF THE DEBTORS' ENTERPRISE VALUE

### I.   Introduction

145. "The expectation for any valuation proceeding is that a value for the subject will thereby be established. In order for a court to assign a specific value or narrow range of values to the subject, however, it must either adopt an expert's opinion or be

54

able to adjust the number generated by the expert to account for changes in assumptions considered necessary by the court." *In re Mirant Corp.*, 334 B.R. 800, 824 (Bankr. N.D. Tex. 2005). The role of the Court was colorfully described in *River Valley Fitness One,* as:

> "[f]lashlight in hand, the Court must review the evidence in the record which supports or refutes the conflicting opinions of the expert appraisal witnesses and the facts and assumptions which form the basis for their opinions. The Court is not bound by the opinion of any expert witness and may accept or reject expert testimony in the exercise of sound judgment."

*River Valley Fitness One v. City of Lebanon (In re River valley Fitness One Ltd. P'ship.),* 2006 Bankr. LEXIS 345 at *24, (Bankr. D.N.H. 2006), *citing Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 295, 58 S. Ct. 932, 82 L. Ed. 1346 (1938).

146. When reviewing an expert opinion regarding the value of a corporation, courts frequently adjust or correct expert opinion analysis in reaching their final opinion on valuation. *See Arnold v. Baisch (In re Great Lakes Boat Repair),* 2006 Bankr. LEXIS 2537, *2 (Bankr. W.D.N.Y. 2006) (while the court elected to go with one experts valuation method, it discounted the final value by 50% due to valid concerns being raised on cross examination); *River Valley Fitness One*, 2006 Bankr. LEXIS 345 at *42-43 (the court adopted a mid point range value for a corporation after they found that the

record did not contain sufficient evidence for the court to conclude one end of a range was more likely the other to be correct); *Mirant*, 334 B.R. at 824 (the court found it necessary to recalculate the value of the corporation due to out-dated data inputs); *Heilig-Meyers Co. v. Wachovia Bank, N.A. (In re Heilig-Meyers Co.)*, 319 B.R. 447 (Bankr. E.D. Va. 2004) (the court, after reviewing two experts opinions, choose to assign their own values to each variable of an insolvency test, picking and choosing numbers from each experts valuation to reach its own conclusion); and *In re Vanderveer Estates Holding*, LLC, 293 B.R. 560, 577 (Bankr. E.D.N.Y. 2003) (the court elected to adopt a combination of two expert's opinions, combining the variables to calculate a new final value.)

147. Thus, in this case, the Court the Court will determine the Debtors' enterprise value by: (i) accepting the opinions of the three experts as to the Debtors' enterprise value; (ii) making adjustments to those opinions to correct for certain errors or inconsistences; (iii) weighing the three expert opinions (as adjusted) based upon the credibility of each expert's opinion and testimony; and (iv) adjusting the weighted average of the experts' opinions to compensate for the May 2006 LRP and the Debtors' performance since June 2006.

## II.  **The Expert Opinions**

### A.  **Chanin**

148. Mr. Belinsky of Chanin tendered an opinion to the Court as to the enterprise value of the Debtors.  This opinion was presented in Mr. Belinsky's valuation report. UBS Ex. 502.  In addition, Mr. Belinsky testified on October 11th - 13th as to his opinion of the Debtors' enterprise value.  Mr. Belinsky concluded that the enterprise value of the Debtors, as of December 31, 2006, ranges from $296.1 million to $333 million with a concluded midpoint value of $314.4 million.

149.  In reaching this conclusion, Mr. Belinsky performed a Discounted Cash Flow analysis, a Comparable Companies analysis, and a Comparable Transactions analysis.  A summary of the results of Mr. Belinsky's analyses are set forth below:

|  | Low Value ($000) | Median Value ($000) | High Value ($000) |
|---|---|---|---|
| DCF Analysis |  |  |  |
| Base Business | 251,000 | 272,400 | 394,400 |
| Growth Ideas | 21,100 | 23,400 | 25,900 |
| DCF Analysis - Consolidated | 272,100 | 295,800 | 320,300 |
| Comparable Companies Analysis | 314,100 | 327,800 | 341,600 |
| Comparable Transactions Analysis | 267,000 | 282,900 | 298,900 |

57

150. Mr. Belinsky weighed his three analyses as follows:

     DCF (consolidated) - 37.5%

     Comparable Companies Analysis - 25%

     Comparable Transactions Analysis - 37.5%.

Thus, Mr. Belinsky's weighted enterprise value ranges from $280.7 million to $317.6 million with a median of $299 million.

151. Finally, Mr. Belinsky added his calculation of the Debtors' excess cash as of December 31, 2006 to his weighted enterprise value to reach his ultimate conclusion of the Debtors' enterprise value, as of December 31, 2006, of between $296.1 million and $333 million with a midrange of $314.4 million.

**B.    FTI**

152. Mr. Braun of FTI also tendered an opinion to the Court as to the enterprise value of the Debtors. This opinion was presented in Mr. Braun's valuation report. Official Committee Ex. 1. In addition, Mr. Braun testified on November 8th and 9th as to his opinion of the Debtors' enterprise value. Mr. Braun concluded that the enterprise value of the Debtors, as of June 28, 2006, is $349 million.

153. In reaching this conclusion, Mr. Braun also performed a Discounted Cash Flow analysis, a Comparable Companies Analysis, and a Comparable Transactions analysis and weighed his analyses. A

summary of the results of Mr. Braun's analyses (and their assigned weights) are set forth below:

| Valuation Analysis | Value ($000) | Weight | Weighted Value ($000) |
|---|---|---|---|
| DCF | 337,322 | 50% | 168,661 |
| Comparable Companies Analysis | 360,680 | 50% | 180,340 |
| Comparable Transactions Analysis | 367,472 | 0% | 0 |
| **Conclusion** | | | **349,001** |

154.  Rather than adding the value of the Debtors' non-operating assets to his weighted average, Mr. Braun included a value of the non-operating assets in each of his analyses, although he did not include any such value in his DCF analysis.  Thus, Mr. Braun concluded that the enterprise value of the Debtors, as of June 28, 2006, is $349 million.

**C.    Houlihan**

155.  Finally, Mr. Hardie of Houlihan tendered an opinion to the Court as to the enterprise value of the Debtors.  This opinion was presented in Mr. Hardie's valuation report. UBS Ex. 517.  In addition, Mr. Hardie testified on November 16th and 17th as to his opinion of the Debtors' enterprise value.  Mr. Hardie concluded that the enterprise value of the Debtors, as of June 22, 2006,

ranges from $301 million to $343 million with a concluded midpoint value of $322 million.[5]

156. In reaching this conclusion, Mr. Hardie performed a Discounted Cash Flow analysis, a Comparable Companies Analysis, and a Comparable Transactions analysis, all of which he weighed equally. A summary of the results of Mr. Hardie's analyses are set forth below:

|  | Low Value ($000) | Median Value ($000) | High Value ($000) |
|---|---|---|---|
| DCF Analysis | 263,600 | 289,250 | 314,900 |
| Comparable Companies Analysis | 310,900 | 329,700 | 348,500 |
| Comparable Transactions Analysis | 288,200 | 306,850 | 325,500 |
| **Weighted Average** | **287,600** | **308,600** | **329,600** |

157. Mr. Hardie concluded that the value of the Debtors' non-operating assets and liabilities ranges from $13.358 million and $13.408 million. Mr. Hardie added this calculation of the Debtors' non-operating assets and liabilities to his weighted enterprise value to reach his ultimate conclusion of the Debtors' enterprise value, as of June 22, 2006, of between $301 million and $343

---

[5]During his testimony, Mr. Hardie updated his conclusion of enterprise value to correct some immaterial errors and to reflect the Debtors' continuing poor performance since June 2006.

million with a midrange of $322 million.

## III. **Adjustments to the Expert Opinions**

158. Each of the three experts – Chanin, FTI and Houlihan – used customary and generally accepted valuation methodologies. *See* ¶¶129-30, *supra*.  The Debtors argue, however, that each of the experts resorted to various inappropriate manipulations to reduce Nellson's enterprise value and that these purported manipulations are not simply questions of interpretation but, rather, they are wholesale deviations from standard valuation practice.  Indeed, the experts themselves criticize each other for making inappropriate adjustments to their respective valuations that are inconsistent with accepted valuation techniques. *See*, *e.g.*, UBS Ex. 518; Official Committee Exs. 3 and 4.  The Debtors argue that "reversing" these purported manipulations results, in each instance, in a corrected enterprise valuation conclusion of approximately $400 million.

159. As an initial matter, the Creditor Parties argue that adjusting the experts' opinions is inappropriate and the opinions should be taken as a whole.  The Court disagrees.  As noted above, when reviewing an expert opinion regarding the value of a corporation, courts frequently adjust the expert opinion analysis in reaching their final opinion on valuation.  *See* ¶146, supra.  Moreover, the purpose of considering an expert opinion is not to

61

substitute the expert for the trier of fact but rather to "*assist the trier of fact to understand the evidence or to determine a fact in issue.*" Fed. R. Evid. 702 (emphasis added).  That said, the Court is mindful that the experts have submitted their respective opinions as a whole and their conclusions are based on a number of factors – many of which are interrelated.  The Creditor Parties oppose the Debtors' "non-expert" adjustments, which the Creditor Parties argue are themselves inappropriate adjustments that are inconsistent with accepted valuation techniques.  Thus, the Court will consider the Debtors' arguments in light of the fact that the experts have submitted their respective opinions as a whole and will only make those adjustments supported by expert evidence that are necessary to make the opinions consistent with accepted valuation techniques.

## A.  <u>Chanin</u>

160. As summarized above, Mr. Belinsky of Chanin based his conclusion on all three standard methodologies, attributing 37.5% of his valuation to the DCF analysis, 25% of his valuation to the Comparable Companies analysis, and 37.5% of his valuation to the Comparable Transactions analysis. *See* ¶¶148-149, *supra*.  The Debtors argue that Mr. Belinsky's conclusion is flawed based upon the arbitrary and inappropriate manipulations he chose to incorporate.  The Debtors note that Mr. Hardie testified that Mr.

Belinsky's valuation contained improper assumptions and math errors that led to incorrect calculations and it was performed in a manner "inconsistent with generally accepted valuation practice." Trial Tr. 11/17/06 (Hardie) at 3839:17-3840:5; *see also* Trial Tr. 11/8/06 (Braun) at 3447:24-3448:9 (FTI "found flaws in Chanin's valuation analysis which resulted in a material understatement of Nellson's enterprise value"). The Debtors further argue that if Mr. Belinsky's inappropriate manipulations are reversed, his valuation of Nellson would easily approach $400 million.

**(i) DCF Analysis**

161. The Debtors make three criticisms of Mr. Belinksy's DCF analysis. First, the Debtors challenge Mr. Belinsky's judgment that the higher risks associated with Nellson's "growth ideas" need to be reflected in the application of a higher discount rate than that applied to Nellson's base business. Second, the Debtors challenge Mr. Belinsky's application of an "emergence risk premium" in order to reflect the challenges Nellson faces in emerging from bankruptcy.[6] Third, the Debtors challenge Mr. Belinsky's use of a multiple based on his Comparable Transactions analysis as opposed to his Comparable Companies analysis in calculating the terminal

---

[6] The Debtors also criticize Mr. Braun for applying an emergence risk premium.

value of Nellson.[7]  Each of these challenges is without merit and no adjustment to Mr. Belinsky's DCF analysis is warranted.

### (a)  Chanin's Separate Consideration of the Riskier "Growth Ideas."

162. Mr. Belinsky used a 20.04% discount rate (adjusted from his "base rate" of 14.04%) for all income relating to Nellson's "growth initiatives." UBS Ex. 502 at pp. 42-43.  Mr. Belinsky testified that he came to the conclusion that the most transparent way to account for the increased risk associated with the growth ideas was to value that income stream separately from the base business. Trial Tr. 10/13/06 (Belinsky) at 3236:6-3237:17.  Mr. Belinsky further testified that the advantage of this approach is that it sets out clearly for the Court the precise value that he ascribes to that increased risk, rather than, as other experts have done, merely factoring that risk into the wider discount rate to be applied to the whole business. *Id.*  No other expert in this case utilized this methodology.

163.  The Debtors argue that this adjustment results in double-counting the risks associated with Nellson's growth initiatives, which were already heavily discounted by Nellson's management.  The Debtors further argue that this approach is inconsistent with existing precedent in this District. *See In re*

---

[7] The Debtors also criticize Mr. Hardie for using a multiple based on his Comparable Transactions analysis as opposed to his Comparable Companies analysis in calculating the terminal value of Nellson.

*Coram Healthcare*, 315 B.R. 321, 340 (Bankr. D. Del. 2004); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 614 (D. Del. 2001); and *In re Exide Tech.*, 303 B.R. 48, 65 (Bankr. D. Del. 2003).  The Debtors are incorrect on the facts and the law.

164.  First, the evidence at trial demonstrated that the revenues ascribed by the Debtors to the "growth ideas" are much riskier than the revenues ascribed to the base business. *See* ¶¶99-108, *supra*.  Moreover, there is no evidence to support the suggestion that Messrs. Dias and Schouten had already "discounted" the substantial revenues and margins assigned to the growth ideas in the May 2006 LRP. *See* ¶104, *supra*.

165.  Moreover, as both Mr. Belinsky and Mr. Hardie testified, ascribing discrete discount rates to value different parts of a business plan is not a novel concept. Trial Tr. 10/12/06 (Belinsky) at 3138:13-3139:12; Trial Tr. 11/17/06 (Hardie) at 3874:7-15. Valuation experts agree that corporate projects should be valued utilizing a discount rate that is commensurate with a project's risk. *Id.*  If a particular project's risk differs from that of the firm as a whole, that project should be discounted at a different rate. *Id.*  This technique is accepted among valuation professionals and has been adopted by respected valuation experts in other cases before the United States Bankruptcy Court. *Id.*

166.  Second, the cases cited by the Debtors do not support

65

their argument.  In both *Coram Healthcare* and *Genesis Healthcare*, the court accepted management's projections as more credible. *See Coram Healthcare*, 315 B.R. at 339-40; and *Genesis Health*, 266 B.R. at 613-14.  The Court did not create an ironclad rule favoring management's projections.  Rather the Court examined the evidence and determined that management's projections were more credible based, in part, on management's proven track record in consistently projecting results accurately.  In this case, where the evidence clearly indicates that management created an unrealistic business plan for ulterior motives and management has a proven track record of projecting results inaccurately, *Coram Healthcare* and *Genesis Healthcare* actually support Mr. Belinsky's approach.[8]

167.  Moreover, the application of a higher discount rate to reflect risky revenue projections is consistent with *In re Zenith Electronics Corp.*, 241 B. R. 92 (Bankr. D. Del. 1999).  In *Zenith*, the court concluded that a higher discount rate was appropriate due to the uncertainty associated with Zenith's introduction of new technology that is "new and untried in the market," without "any established sales," which carries "significant" inherent risks,

---

[8]The Debtors' citation to *Exide Tech.* in this instance is inapposite. In *Exide Tech.*, the court held that it is appropriate to consider a DCF analysis in determining value and no less weight should be accorded a DCF analysis simply because it relies on projections. *In re Exide Tech.*, 303 B.R. at 65.  *Exide Tech.* simply does not address the issue here – the appropriate discount rate to be applied in performing the DCF analysis itself when there is evidence that management's projections may be unrealistic.

including "the risk that consumers may not embrace the new technology." *Id.* at 103-04.

**(b) Chanin's Application of an Emergence Risk Premium**

168.   In calculating the appropriate discount rate to apply to the Debtors' future cash flows, Mr. Belinsky incorporated an "emergence premium" equivalent to 2.05% into the calculation. Trial Tr. 10/13/06 (Belinsky) at 3172:9-10.  Similarly, Mr. Braun of FTI included a 6% adjustment in his discount rate as a "company specific risk premium." Trial Tr. 11/8/06 (Braun) at 3554:20-24; Official Committee Ex. 1 at p. 4.  Messrs. Belinsky and Braun both testified that it is typical for companies to face difficulties as they emerge from bankruptcy, and in the years immediately following their emergence, as they seek to re-establish their businesses and reputations.  Trial Tr. 10/12/06 (Belinsky)at 3009:8-3010:6; Trial Tr. 11/08/06 (Braun) at 3361:4-3363:24; Trial Tr. 11/9/06 (Braun) at 3623:8-3624:14.  They further testified that, for this reason, it is standard and accepted valuation practice to reflect these challenges by applying a risk premium. *Id.*  Both Chanin and FTI applied a premium in determining the appropriate discount rate to account for the increased risks to earning capacity that the Debtors face as a result of being in bankruptcy and emerging from bankruptcy. Trial Tr. 10/12/06 (Belinsky) at 3009:3-3010:6; Trial Tr. 11/8/06 (Braun) at 3361:4-3363:24; Trial Tr. 11/9/06 (Braun) at

67

3623:8-3624:14; *see also* UBS Ex. 502 at p. 44; Official Ex. 1 at p. 4.[9]

169.  The Debtors argue that application of such a premium is inconsistent with the Supreme Court's decision in *Consolidated Rock*, which requires valuations to be based on the debtor's earnings capacity, rather than market perceptions in the context of bankruptcy.  *See Consolidated Rock Prods. Co. v. Dubois*, 312 U.S. 510, 526, 61 S.Ct. 675, 85 L.Ed.2d. 982 (1941).

170.  *Consolidated Rock* does not stand for the proposition asserted by the Debtors – it does not even mention, much less analyze the application of an emergence premium.  *Id.*  Rather, *Consolidated Rock* establishes that the key criteria in valuing a company should be that company's "earning capacity" rather than its market value during bankruptcy, because, among other things, being in bankruptcy will harm that market value.  *Id.*  According to the Supreme Court, this estimate of earning capacity should be:

---

[9]Messrs. Belinsky and Braun testified that the premium was applied for additional risk factors facing Nellson such as limited customer pool, etc., it is clear that the overwhelming basis for applying the premium is the increased risks to earning capacity that the Debtors face as a result of being in bankruptcy and emerging from bankruptcy.

> "based on an informed judgment which embraces all
> facts relevant to future earning capacity and hence
> to present worth, including, of course, the nature
> and condition of the properties, the past earning
> records record and all circumstances which indicate
> whether or not that record is a reliable criterion
> of future performance."

*Id.* at 526.

171. It is precisely in accordance with this direction from the Supreme Court that valuation professionals now engage in valuation methodologies such as the DCF analysis, and make adjustments such as applying a bankruptcy emergence premium, so as to estimate a company's earning capacity. Consistent with this ruling, both Messrs. Belinsky and Braun applied an emergence risk premium to reflect the risk that Nellson's distressed situation might negatively impact its earning capacity over the life of the Debtors' five-year plan.

172. As the court explained in *Exide Tech.*, while paraphrasing Collier on Bankruptcy, "modern finance has caught up with the Supreme Court's direction in *Consolidated Rock* by providing courts with valuation methodologies that focus upon earning capacity, such as the comparable company analysis and the discounted cash flow analysis." *Exide Tech.*, 303 B.R at 65-66. Such methodologies are adopted exactly for the purpose of reflecting various risks, such as those identified in an emergence premium, which will affect a company's future earning capacity. Indeed, the court in *Exide*

69

*Tech.* accepted the discount rate analysis of the creditors committee's expert, which contained a risk premium. *Id.* at 64, n. 33. Far from rendering inappropriate the adoption of an emergence premium, *Consolidated Rock* actually enunciated the very basis for its existence.

### (c) Chanin's Selection Of Multiple For Its Terminal Value

173. In calculating the Debtors' terminal value in the DCF analysis, Mr. Belinsky applied a multiple of 7.0 x EBITDA. UBS Ex. 502 at pp. 42-43. Mr. Belinsky derived this multiple from his Comparable Transactions analysis. *Id.* Similarly, Mr. Hardie of Houlihan derived his terminal value multiple from his Comparable Transactions analysis. UBS Ex. 517 at p. 23.

174. The Debtors argue that the Messrs. Belinsky and Hardie erred in using the Comparable Transactions analysis to derive the terminal multiple in the DCF analysis. The Debtors argue that they should have applied the more common method of using a terminal value multiple derived from the Comparable Companies analysis rather than relying on "stale" transactions. In support of the argument, the Debtors rely on the testimony of Mr. Braun of FTI, who stated that "it is common, when using a multiple approach, as Chanin did to calculate terminal value, to rely on multiples of comparable companies." Trial Tr. 11/8/06 (Braun) at 3450:2-9. In Mr. Belinsky's case, the Debtors argue that Mr. Belinsky should

have applied a multiple of 8.9 x EBITDA (rather than 7.0 x EBITDA) based upon the median Comparable Companies multiple over the last twelve month period. *See* UBS Ex. 502 at p. 30.

175. The Debtors and Mr. Braun are incorrect because they ignore that, in using a terminal multiple to calculate terminal value, a valuation expert is attempting to estimate what the company would be worth were it acquired or subject to merger in the terminal year. Trial Tr. 10/12/06 (Belinsky) at 2961:8-13. By definition, therefore, the appropriate proxy for this value is to be found in a Comparable Transactions analysis as opposed to the Comparable Companies analysis.

176. Moreover, the Debtors' argument on this point implicates the *caveat* raised above, *i.e.*, the Court will consider the Debtors' arguments in light of the fact the experts have submitted their respective opinions as a whole and will only make those adjustments supported by expert evidence that are necessary to make the opinions consistent with accepted valuation techniques. *See* ¶159, *supra*.  In this instance, the Debtors' criticism of Messrs. Belinsky and Hardie fails to rise to that level.  Mr. Braun's tepid testimony that "it is common . . . to rely on multiples of comparable companies" to determine terminal value is insufficient to establish that making such an adjustment is necessary to comply with accepted valuation techniques.

**(ii) Comparable Companies Analysis**

177.  The Debtors make two criticisms of Mr. Belinsky's Comparable Companies analysis.  First, the Debtors challenge Mr. Belinsky's use of revenues in his Comparable Companies analysis.  The Debtors argue that the Comparable Companies analysis should be conducted solely with reference to Nellson's EBITDA with no consideration being given to Nellson's revenues.[10]  Second, the Debtors challenge Mr. Belinsky's selection of an EBITDA multiple of 8.0, which the Debtors claim is inappropriately low.  While the Debtors are incorrect on the first argument, their second argument raises, in part, a valid criticism of Mr. Belinsky's opinion that must be corrected.

**(a)   Chanin's Use Of Revenues In Its Comparable Companies Analysis.**

178.  In conducting his Comparable Companies analysis, Mr. Belinsky analyzed both EBITDA and revenues and weighed each approach equally. UBS Ex. 502 at p. 30.  Specifically, Mr. Belinsky used a multiple of 1.0 x 2006 projected net revenues and 8.0 x 2006 projected EBITDA to arrive at values of $314.1 million and $341.6 million, respectively.  UBS Ex. 502 at p. 27.  By averaging these totals, Mr. Belinsky concluded that Nellson's enterprise value - based on the Comparable Companies analysis and exclusive of non-

_____

[10] The Debtors also criticize Mr. Braun and Mr. Hardie for including revenues in their Comparable Companies analysis.

operating assets/liabilities – is $327.8 million. *Id.* As discussed above, Mr. Belinsky's Comparable Companies analysis accounted for 25% of his ultimate conclusion of the Debtors' enterprise value (exclusive of non-operating assets/liabilities). *See* ¶149, *supra*.

179. The Debtors argue that because the Debtors are a highly profitable enterprise, it is not appropriate to value the Debtors based on a measure of revenues. Rather, the Debtors argue that fair market value is derived from earnings or the potential to generate earnings and not revenues. Moreover, the Debtors argue that their argument is consistent with the *Consolidated Rock* mandate that an expectation of earnings is the essence of a bankruptcy debtor's enterprise value. The Debtors are incorrect on both counts.

180. All three experts used both revenue and EBITDA multiples in conducting their Comparable Companies analysis. UBS Ex. 502 at p. 29, Official Committee Ex. 1 at p. 17, UBS Ex. 517 at p. 21.[11] Revenue, along with EBITDA, is an important indicator of the earning capacity and value of a company. Indeed, without revenue a company has no earnings. Revenue growth when measured over a historical time period is a key indicator of a company's future prospects and earnings potential. In addition, revenue, unlike EBITDA and earnings, is less susceptible to being influenced by

---

[11] Mr. Braun also used EBIT (earnings before interest and tax). Official Committee Ex. 1 at p. 17 (Ex. 4).

accounting decisions related to expensing certain operating and other costs.  As a result, all three experts agree that it is standard valuation practice to use a blend of EBITDA and revenue in conducting a proper Comparable Companies analysis.  Trial Tr. 11/16/06 (Hardie) at 3693:17-3694:1; Trial Tr. 11/8/06 (Braun) at 3333:8-23, 3334:23-3335:15; Trial Tr. 11/9/06 (Braun) at 3543:16-3352:7.  *Consolidated Rock* instructs the Court to consider the Debtors' earning capacity but not to ignore other risk factors or indicators affecting that earning capacity.  *See* ¶¶169-172, *supra*. In this case, that indicator is revenue and its consideration is wholly appropriate under *Consolidated Rock.*

**(b)   Chanin's Selection of EBITDA Multiple In Its Comparable Companies Analysis**

181.  In conducting his Comparable Companies analysis, Mr. Belinsky used a multiple of 8.0 x 2006 projected EBITDA. UBS Ex. 502 at p. 27.  The Debtors argue that Mr. Belinsky's selection of an EBITDA multiple of 8.0 is too low because Mr. Belinsky failed to use the median EBITDA multiple of the comparable companies analyzed, which was 8.9.  Moreover, the Debtors argue that the median EBITDA multiple of the comparable companies would have been even higher if Mr. Belinsky had not excluded a certain comparable company – Natural Alternatives – from the Comparable Companies analysis (a company subsequently used by Mr. Belinsky in his

Comparable Transactions analysis). The Debtors argue that, at the very least, Mr. Belinsky should have used a multiple of 8.9 x 2006 projected EBITDA. The Court agrees.

182. Mr. Belinsky testified that his selection of the appropriate EBITDA multiple was an exercise in expert judgment and not simple arithmetic and that the selection of the relevant multiple reflected a number of critical qualitative differences between the Debtors and the public companies identified by Chanin. Trial Tr. 10/12/06 (Belinsky) at 2989:8-2992:19; UBS Ex. 502 at pp. 22, 31. Moreover, Mr. Belinsky testified that he excluded Natural Alternatives from his Comparable Companies analysis due to its small market capitalization and low trading volume – issues inapplicable to a Comparable Transactions analysis. Trial Tr. 10/12/06 (Belinsky) at 2987:22-2989:1; Trial Tr. 10/13/06 (Belinsky) at 3211:5-3212:4, 3218:16-3220:7; UBS Ex. 502 at p. 31.

183. While the Court has no issue with Mr. Belinsky's exercise of his judgment to exclude Natural Alternatives from his Comparable Companies analysis, Mr. Belinsky's decision to use an EBITDA multiple of 8.0 rather than the median of 8.9 is without support. Mr. Belinsky testified that his selection of the appropriate EBITDA multiple was an exercise in expert judgment and not simple arithmetic. While that may be true, the Court notes that in virtually every instance that one of the Creditor Parties' experts

chose to "exercise judgment" rather than apply arithmetic, the effect of the exercise of that judgment was to lower the concluded value of the Debtors' enterprise value. Moreover, in certain instances, the experts lowered value in the face of evidence indicating that the Debtors may be entitled to a higher value. That is the case in this instance. *See* Trial Tr. 10/11/06 (Belinsky) at 3088:12-3089:1; 3091:17-3093:6.

184.  Thus, the Court finds that Mr. Belinsky should have used a multiple of 8.9 x 2006 projected EBITDA ($42.7 million) in conducting his Comparable Companies analysis. The use of a multiple of 8.9 x 2006 projected EBITDA results in a value of $380.03 million. Recall that in conducting his Comparable Companies analysis, Mr. Belinsky analyzed both EBITDA and revenues and weighed each approach equally. By averaging the revised EBITDA value of $380.03 million with the revenue value of $314.1 million, Mr. Belinsky's corrected conclusion of Nellson's enterprise value - based on the Comparable Companies analysis and exclusive of non-operating assets/liabilities - is $347.1 million.[12]

**(iii) Comparable Transactions Analysis**

185.  The Debtors argue that Mr. Belinsky's Comparable Transactions analysis is not consistent with standard valuation

---

[12]How this correction affects Mr. Belinsky's ultimate conclusion of enterprise value is discussed in ¶198 below.

practice because the transactions utilized by Mr. Belinsky are not comparable transactions - they are too old and the transactions are too small.[13]  Specifically, the Debtors argue that only 2 of the 17 transactions analyzed by Mr. Belinsky are comparable because: (i) they occurred less than two years ago; and (ii)  they involved a company with an enterprise value large enough to be considered comparable.  The Debtors further argue that with so few valid data points (2 as opposed to 17), the Comparable Transactions analysis should not be accorded any weight.[14]  The Debtors are incorrect, although Mr. Belinsky's conclusion must be adjusted to correct his chosen multiples, which once again were below the median.

186. In performing his Comparable Transactions analysis, Mr. Belinsky analyzed 17 comparable companies. UBS Ex. 502 at pp. 39-40.  As with his Comparable Companies analysis, Mr. Belinsky analyzed both EBITDA and revenues and weighed each approach equally. UBS Ex. 502 at p. 27.  Specifically, Mr. Belinsky used a multiple of 0.85 x 2006 projected net revenues and 7.0 x 2006 projected EBITDA to arrive at values of $267.0 million and $298.9 million, respectively. *Id.* By averaging these totals, Mr. Belinsky

---

[13]The Debtors also criticize Mr. Hardie for according his Comparable Transactions analysis any weight.

[14]In the alternative, the Debtors argue that the Comparable Transactions analysis be recalculated using transactions from year 2004 forward and of comparable size.

concluded that Nellson's enterprise value - based on the Comparable Transactions analysis and exclusive of non-operating assets/liabilities - is $282.9 million. *Id.* As discussed above, Mr. Belinsky's Comparable Transactions analysis accounted for 37.5% of his ultimate conclusion of the Debtors' enterprise value (exclusive of non-operating assets/liabilities). *See* ¶149, *supra*.

187. The 17 analyzed transactions were divided into three groups: (i) Nellson Related Transactions; (ii) Other Contract or Private Label Manufacturers; and (iii) Branded Manufacturers/Distributors (Bar and/or Powder Focused). UBS Ex. 502 at pp. 39-40. The dates of the transactions ranged from May 1, 2001 through April 5, 2005, with 2 transactions in 2001, 2 in 2002, 7 in 2003, 5 in 2004 and 1 in 2005. *Id.*

188. The Debtors argue that it is questionable whether transactions that took place more than two years ago are comparable. *See* Trial Tr. 11/8/06 (Braun) at 3455:8-19 ("transactions which took place more than a year or two previously . . . should generally be given little or no weight"). There is, however, no bright line rule branding transactions occurring more than two years ago as irrelevant for the purposes of conducting a Comparable Transactions analysis. Trial Tr. 11/9/06 (Braun) at 3455:20-3456:16. It should go without saying that the entire point of a Comparable Transactions analysis is to identify comparable

78

transactions.  While no transaction will be perfectly comparable, the more similar the target company in the transaction is to the company being valued, the more confidence one can place in the result.  Trial Tr. 10/11/06 (Belinsky) at 2929:1-20; Trial Tr. 11/9/06 (Braun) at 3455:20-3456:16; Trial Tr. 11/16/06 (Hardie) at 3713:13-3714:3.  *See also* ¶141, supra.  Timing is, of course, relevant.  But, it is just one factor that may be important to consider in reaching a decision about comparability.

189.  In this instance, there were several transactions involving comparable companies that occurred more than two years ago, including transactions involving Nellson, the very same company now under consideration.  Mr. Belinsky testified that "the Nellson related transactions are dead-on comparables" meaning "in terms of comparability, there can be no greater comp than the Nellson transactions themselves."  Trial Tr. 10/13/06 (Belinsky) at 3221:2-8; Trial Tr. 10/12/06 (Belinsky) at 3105:15-21.

190.  In sum, in this case, it was a reasonable exercise of Mr. Belinsky's judgment to include older transactions in order to capture transactions involving more similar (or identical) target companies.  It would have been similarly reasonable to determine, as Mr. Braun of FTI did, that the benefits of including such companies in the analysis were outweighed by the passage of time. The issue is sufficiently close to leave the choice of what

79

constitutes a comparable transaction in the expert's discretion.

191. Although the Court will not disturb Mr. Belinsky's choice of comparable transactions in this instance, his application of the data derived from those transactions is incorrect. As with his Comparable Companies analysis, Mr. Belinsky's chose to use multiples lower than the median. Specifically, Mr. Belinsky used a multiple of 0.85 x 2006 projected net revenues rather than the median value of 0.90. In addition, Mr. Belinsky used a multiple of 7.0 x 2006 projected EBITDA rather than the median value of 7.35.

192. The Court finds that Mr. Belinsky should have used a multiple of 0.90 x 2006 projected net revenues ($314.1 million) and 7.4 x 2006 projected EBITDA ($42.7 million) to arrive at values of $282.7 million and $316.0 million, respectively. *Id.* By averaging these totals, Mr. Belinsky should have concluded that Nellson's enterprise value - based on the Comparable Transactions analysis and exclusive of non-operating assets/liabilities - is $299.4 million.[15]

**(iv) The Debtors' Non-Operating Assets**

193. A proper calculation of a company's enterprise value should include cash and other assets, the value of which is not captured in performing the standard methodologies. *See, e.g., Coram Healthcare*, 315 B.R. at 341 ("[T]he valuation of the Debtors

---

[15] How this correction affects Mr. Belinsky's ultimate conclusion of enterprise value is discussed ¶198 below.

for purposes of confirmation must include all assets, even those a buyer may not value.").

194. Mr. Belinsky included the value of the Debtors' non-operating assets in reaching his conclusion of the Debtors' enterprise value. UBS Ex. 502 at pp. 26, 49-50. Mr. Belinsky determined that the only non-operating asset of the Debtors of any material value is the Debtors' excess cash, which he valued at $15.4 million. *Id.* at 50. Mr. Belinsky specifically determined that there in no value to those certain tax attributes of the Debtors discussed in a June 6, 2006 memorandum from PriceWaterhouseCoopers (the "PWC Memorandum"), which was admitted into evidence as Debtors Ex. 17. UBS Ex. 502 at p. 49.

195. The Debtors challenge Mr. Belinsky's calculation of the value of the Debtors' non-operating assets on two grounds. First, the Debtors argue that the full amount of the Debtors' latest cash balance of approximately $23 million should be included in valuing the company. Second, the Debtors argue that the tax attributes of the Debtors' set forth in the PWC Memorandum, which the Debtors value at $15.6 million, should also be included. Thus, the Debtors argue that Mr. Belinsky's conclusion of enterprise value should include $38.6 million rather than $15.4 million for non-operating assets. The Debtors are incorrect.

196. The Debtors' current cash balance (net of accrued

professional fees) is approximately $23 million.  However, the Debtors' own May 2006 LRP provides that the Debtors needs a minimum of $15 million in available cash to operate its business.  Debtors Ex. 5 at p. 7.  The Debtors' attempt through trial testimony to reduce its purported need to $5 million was not persuasive, especially in light of the Debtors' continuing poor performance. If anything, the evidence suggests that Mr. Belinsky *overvalued* the Debtors' excess cash.  In any event, the Court is not persuaded that Mr. Belinsky's valuation of the Debtors' excess need be adjusted upward or downward.

197. The Debtors also argue that the tax attributes discussed in the PWC Memorandum will remain in existence coming out of the bankruptcy case and have significant value.  The Debtors value those attributes at $15.6 million, based upon anticipated tax savings discounted over time.  Debtors Ex. 3 at p. 54.  The PWC Memorandum, however, specifically provides that the Debtors emerge from chapter 11 with no less than $200 million in restructured long-term indebtedness for the tax attributes to have any value. Debtors Ex. 17 at p. 1.  More importantly, the PWC Memorandum is a summary of a "high-level review," which provides PWC's "preliminary conclusions." Id. Given the uncertainty that the Debtors could emerge from Chapter 11 with $200 million in long-term debt and the preliminary nature of the PWC Memorandum, Mr. Belinsky's

determination that the tax attributes have a value of $0 is completely reasonable and will not be disturbed by the Court.

**(v) Conclusion**

198. Mr. Belinsky based his conclusion on all three standard methodologies, attributing 37.5% of his valuation to the DCF analysis, 25% of his valuation to the Comparable Companies analysis, and 37.5% of his valuation to the Comparable Transactions analysis. He then added the value of the Debtors' non-operating assets to reach his conclusion as to the Debtors' enterprise value. As set forth above, Mr. Belinsky made some errors in reaching his conclusion. Upon correction of those errors, Mr. Belinsky's calculation of the Debtors' enterprise value is $325.4 million. The calculation is set forth below.

| | Corrected Value ($000) | Weight | Weighted Value ($000) |
|---|---|---|---|
| DCF Analysis – Consolidated | 295,800 | 37.5% | 110,925 |
| Comparable Companies Analysis | 347,100 | 25% | 86,775 |
| Comparable Transactions Analysis | 299,400 | 37.5% | 112,275 |
| Value of Operating Assets | | | 309,975 |
| Value of Non-Operating Assets | 15,400 | 100% | 15,400 |
| Total Enterprise Value | | | 325,375 |

## B. **FTI**

199.  As summarized above, Mr. Braun of FTI based his conclusion on all three standard methodologies, attributing 50% of his valuation to his DCF analysis and 50% of his valuation to his Comparable Companies analysis.  Mr. Braun did not accord any weight to his Comparable Transactions analysis. *See* ¶¶152-154, *supra*.  The Debtors argue that, although Mr. Braun correctly chose not to accord any weight to his Comparable Transactions analysis, he nonetheless made various manipulations to his DCF and Comparable

84

Companies analyses that, when corrected, result in a valuation of the Debtors that easily exceeds $400 million.

### (i) DCF Analysis

200.  The Debtors make two criticisms of Mr. Braun's DCF analysis.  First, the Debtors challenge Mr. Braun's application of a "company specific risk premium" in order to reflect the challenges Nellson faces in emerging from bankruptcy.  Second, the Debtors challenge Mr. Braun's exclusion of any value to the Debtors' non-operating assets in his DCF analysis (even though he attributed $18.19 million of value to non-operating assets in both his Comparable Companies and Comparable Transactions analyses).  Both of these challenges raise, in part, valid criticisms of Mr. Braun's opinion that must be corrected.

### (a)    FTI's Application of a Company Specific Risk Premium

201.  In calculating the appropriate discount rate to apply to the Debtors' future cash flows, Mr. Braun of FTI included a 6% adjustment in his discount rate as a "company specific risk premium."  Trial Tr. 11/8/06 (Braun) at 3554:20-24; Official Committee Ex. 1 at p. 4.  As discussed above, it is consistent with accepted valuation practice and the controlling law for an expert to apply a premium in determining the appropriate discount rate to account for the increased risks to earning capacity that the

Debtors face as a result of being in bankruptcy and emerging from bankruptcy. *See* ¶¶168-172, *supra*.

202. Nonetheless, Mr. Braun's application of a 6% adjustment is excessive. Mr. Braun stands in stark contrast to Mr. Belinsky who made a 2.05% adjustment and Mr. Hardie who did not apply a risk premium at all. Notwithstanding the foregoing, Mr. Braun could provide little explanation of the basis for making such a significant adjustment to the discount rate. Trial Tr. 11/9/06 (Braun) at 3591:5-3593:10 ("I did not try to assign a specific risk premium to a specific risk characteristic. I looked at the risk characteristics as a whole and derived my premium by consideration of the risk characteristics as a whole."). Moreover, as with any adjustment to a discount rate in a DCF analysis, Mr. Braun's company specific risk premium has a profound effect on his conclusion. For example, even a 1% change in the risk premium (*i.e.*, decreasing it to 5% from 6%) results in a nearly $15 million increase in Nellson's value.

203. The Court finds that while it was appropriate for Mr. Braun to apply a premium in determining the appropriate discount rate, that premium should have been no more than 4%. As a result, Mr. Braun's corrected conclusion of the Debtors' enterprise value - based on his DCF analysis and exclusive of non-operating

assets/liabilities - is $351.9 million.[16]

### (b) FTI's Exclusion Of Any Value To The Debtors' Non-Operating Assets In Its DCF Analysis

204. In performing his DCF analysis, Mr. Braun did not attribute any value to the Debtors' non-operating assets in his DCF analysis. Trial Tr. 11/9/06 (Braun) at 3505:8-11; 3506:4-11. A proper calculation of a company's enterprise value should include non-operating assets such as cash and other assets. *See* ¶193, *supra*. Messrs. Belinsky and Hardie both included the value of the Debtors' non-operating assets in reaching their conclusion of the Debtors' enterprise value. UBS Ex. 502 at pp. 26, 49-50; UBS Ex. 517 at p. 17. Both experts, however, included the value of the Debtors' non-operating assets by adding it to the weighted average of the DCF, Comparable Companies and Comparable Transactions analyses. *Id.*

205. Mr. Braun, however, incorporated his ascribed value to the Debtors' non-operating assets ($18.19 million) into his Comparable Companies analysis and Comparable Transactions analysis but failed to do in connection with his DCF analysis. This was an

---

[16]Reducing the company specific risk premium to 4% lowers the cost of equity under Mr. Braun's WACC calculation from 23.36% to 21.36%, which in turn reduces the WACC to 13.7% or 14% on a rounded basis. Without applying any other changes to Mr. Braun's DCF analysis, reducing the discount rate to 14% reduces his concluded value to $351,853,000. *See Debtors' Memorandum in Support of [Proposed] Findings of Fact and Conclusions of Law [Docket Nos. 871 and 873] at p. 43.* How this correction affects Mr. Braun's conclusion of enterprise value is discussed in ¶214 below.

error that, based on the weight Mr. Braun accorded the various valuation methodologies, had the effect of discounting the value of the Debtors' non-operating assets by 50%. Thus, the Court finds that Mr. Braun should have included an additional $18.19 million of value in his DCF analysis, resulting in a corrected conclusion of the Debtors' enterprise value - based on his DCF analysis, including the correction from ¶¶201-203, *supra*, and inclusive of non-operating assets/liabilities - of $370.1 million.[17]

**(ii) Comparable Companies Analysis**

206. The Debtors make two criticisms of Mr. Braun's Comparable Companies analysis. First, the Debtors challenge Mr. Braun's use of revenues and EBIT in his Comparable Companies analysis. The Debtors argue that the Comparable Companies analysis should be conducted solely with reference to Nellson's EBITDA. Second, the Debtors challenge Mr. Braun's selection of an EBITDA multiple of 8.5, which the Debtors claim is inappropriately low. The Debtors are incorrect on both counts.

**(a)   FTI's Use Of Revenues and EBIT In Its Comparable Companies Analysis**

207. In conducting his Comparable Companies analysis, Mr. Braun analyzed EBITDA, EBIT and revenues and weighed each approach

---

[17]This amount is derived from *Debtors' Memorandum in Support of [Proposed] Findings of Fact and Conclusions of Law [Docket Nos. 871 and 873] at Ex. B-9* . How this correction affects Mr. Braun's conclusion of enterprise value is discussed in ¶214 below.

equally. Official Committee Ex. 1 at p. 17 (Ex. 4). Specifically, Mr. Braun used a multiple of 8.5 x LTM EBITDA, 9.5 x LTM EBIT, and 1.0 x LTM total revenues, to arrive at values of $377.56 million, $345.9 million and $305.05 million, respectively. Official Committee Ex. 1 at pp. 5-6, 17 (Ex. 4) 19 (Ex. 6). By averaging these totals, Mr. Braun concluded that Nellson's enterprise value - based on the Comparable Companies analysis and inclusive of non-operating assets/liabilities - is $360.68 million. *Id.* As discussed above, Mr. Braun's Comparable Companies analysis accounted for 50% of his ultimate conclusion of the Debtors' enterprise value. *See* ¶153, *supra*.

208. The Debtors argue that because the Debtors are a highly profitable enterprise, it is not appropriate to value the Debtors based on a measure of revenues. As discussed above, *see* ¶180, *supra*, the use of revenue in this instance is consistent with standard valuation practice and the controlling law.

209. The Debtors further argue that it is not appropriate to use EBIT multiples in this case because the Debtors have larger amounts of depreciation and amortization than the comparable companies. In other words, the Debtors argue that the depreciation and amortization of the Debtors is not comparable to the companies examined by Mr. Braun and the use of EBIT in this instance undervalues the Debtors. As with revenue, EBIT is an important

89

indicator of the earning capacity and value of a company. Moreover, there is simply no evidence to support the Debtors' assertion that the depreciation and amortization of the Debtors is such to make Mr. Braun's analyzed companies not comparable. Indeed, it defies logic that these companies are comparable to Nellson when EBITDA is analyzed but the same companies are somehow not comparable when EBIT or revenue is analyzed.

**(b)    FTI's Selection of EBITDA Multiple In Its Comparable Companies Analysis**

210.  In conducting his Comparable Companies analysis, Mr. Braun used a multiple of 8.5 x LTM EBITDA. Official Committee Ex. 1 at pp. 5-6, 17 (Ex. 4), 19 (Ex. 6).  The Debtors argue that Mr. Braun's selection of an EBITDA multiple of 8.5 is too low because Mr. Belinsky failed to use the median EBITDA multiple of the companies analyzed, which was 10.6 (after excluding an outlier).

211.  Mr. Braun used a multiple of 8.5 x LTM EBITDA, which was the highest multiple chosen by any expert (including the Debtors' expert, who arrived at a 7.5  multiple of EBITDA for nutraceutical companies).  Trial Tr. 11/8/06 (Braun) at 3326:2-3.  Moreover, Mr. Braun was the only expert that employed a "control premium" in connection with his Comparable Companies analysis.   Trial Tr. 11/8/06 (Braun) at 3315:9-18.  That 30% control premium increased the resulting multiples (including EBITDA) derived and used in his

90

Comparable Company analysis. *Id.* at 3314:13-15.   Thus, notwithstanding Mr. Braun's departure from the use of the median value, Mr. Braun's use of a multiple of 8.5 x LTM EBITDA in his Comparable Companies analysis is both reasonable and intertwined with his use of a control premium.   Thus, his conclusion will not be disturbed by the Court.

### (iii) Comparable Transactions Analysis

212. Mr. Braun performed a Comparable Transactions analysis but accorded it no weight in reaching his conclusion of the Debtors' enterprise value.   Official Committee Ex. 1 at pp. 6-7, 18 (Ex. 5).   In effect, Mr. Braun determined that the transactions he analyzed were not comparable due to their size and age.   The Debtors agree with Mr. Braun's decision and raise no issue with his decision.   As discussed above, *see* ¶190, *supra*, the Court finds that it was reasonable for Mr. Braun to determine that the benefits of giving weight to the Comparable Transactions analysis were outweighed by the age and size of the comparable transactions.   As with Mr. Belinsky, the issue is sufficiently close to leave the choice of what constitutes a comparable transaction in the expert's discretion.

### (iv) The Debtors' Non-Operating Assets

213. As corrected (*see* ¶¶204-05, *supra*), Mr. Braun included the value of the Debtors' "non-operating assets" in reaching his

conclusion of the Debtors' enterprise value. Official Committee Ex. 1 at pp. 17-18 (Exs. 4-5). Mr. Braun determined that the only non-operating asset of the Debtors of any material value is the Debtors' excess cash ($24.51 million) minus the present value of certain future non-recurring expenses ($6.32 million), which he valued at a total of $18.19 million. *Id.* The Debtors argue that Mr. Braun's conclusion of enterprise value should include $38.6 million rather than $18.19 million for non-operating assets. For the reasons discussed in ¶¶196-97, *supra*, the Court is not persuaded that Mr. Braun's valuation of the Debtors' non-operating assets need be adjusted upward or downward.

**(v) Conclusion**

214. Mr. Braun based his conclusion on all three standard methodologies, attributing 50% of his valuation to his DCF analysis, 50% of his valuation to his Comparable Companies analysis, and 0% of his valuation to his Comparable Transactions analysis. He incorporated the value of the Debtors' non-operating assets in each of his valuation methodologies. As set forth above, Mr. Braun made some errors in reaching his conclusion. Upon correction of those errors, Mr. Braun's calculation of the Debtors' enterprise value is $365.4 million. The calculation is set forth below.

92

|  | Corrected Value ($000) | Weight | Weighted Value ($000) |
|---|---|---|---|
| DCF Analysis | $370,100 | 50% | 185,050 |
| Comparable Companies Analysis | 360,680 | 50% | 180,340 |
| Comparable Transactions Analysis | 367,472 | 0% | 0 |
| **Total Enterprise Value** | | | **365,390** |

## C.    **Houlihan**

215.    As summarized above, Mr. Hardie of Houlihan based his conclusion on all three standard methodologies, which he weighed equally. *See* ¶¶155-157, *supra*.    The Debtors argue that Mr. Hardie made various manipulations to his analyses that, when corrected, result in a valuation of the Debtors that easily approaches $400 million.

### (i) DCF Analysis

216.    The Debtors make two criticisms of Mr. Hardie's DCF analysis.    First, the Debtors challenge Mr. Hardie's calculation of his "size risk premium" in determining his discount rate. Second, the Debtors challenge Mr. Hardie's use of a multiple based on his Comparable Transactions analysis as opposed to his Comparable Companies analysis in calculating the terminal value

of Nellson.  While the Debtors are incorrect on the second argument, their first argument raises a valid criticism of Mr. Hardie's opinion that must be corrected.

**(a) Houlihan's Calculation of a Size Risk Premium**

217.  Mr. Hardie applied a discount rate of 14.9% in his DCF analysis.  UBS Ex. 517 at p. 23.  This discount rate includes a size risk premium.  Messrs. Belinsky and Braun also utilized a size risk premium.  UBS Ex. 502 at pp. 44, 46; Official Committee Ex. 1 at p. 16 (Ex. 3). The size risk premium is the adjustment to the cost of equity that is part of the weighted average cost of capital calculation in the DCF analysis.  This adjustment is derived by reference to standardized sources (such as Ibbotson).  Mr. Hardie chose a size risk premium of 6.41%, based on the 10th decile in the Ibbotson manual.  *Id.* at p. 51.  Messrs. Belinsky and Braun concluded that it was more precise and appropriate to use the micro-cap size risk premium of 3.95%, based on a blend of the 9th and 10th deciles.

218.  Mr. Hardie admitted at trial that, strictly by applying the math, Nellson would go into the 9th decile.  Trial Tr. 11/16/06 (Hardie) at 3747:2-8.  However, he defended his decision to utilize the 10th decile by stating that the choice of the input would create a circular analysis, especially when the resulting equity value would be very close to the break points on

94

the Ibbotson decile chart.  Trial Tr. 11/16/06 (Hardie) at
3748:21-3749:5.  On cross examination, Mr. Hardie acknowledged
that an analyst could use the micro-cap risk premium (like
Messrs. Braun and Belinsky), which is a blend of the 9th and 10th
decile, as an alternative way of handling the circular analysis
when the equity borders two size classifications.  Trial  Tr.
11/16/06 (Hardie) at 3879:6-16.  Nonetheless, Mr. Hardie chose
the 10th decile (which pre-supposed a lower valuation of Nellson)
and used a size risk premium of 6.41% as opposed to 3.95%, which
reduced Houlihan's discount rate from 14.9% to 12.7% and,
thereby, reduced Nellson's value.  This was an error that had the
effect of "predetermining" Mr. Hardie's conclusion of enterprise
value.  The Court finds that Mr. Hardie should have used the
micro-cap risk premium of 3.95%, which results in a discount rate
of 12.7%.  As a result, Mr. Hardie's corrected conclusion of the
Debtors' enterprise value - based on the DCF analysis and
exclusive of non-operating assets/liabilities - is $314.2
million.[18]

**(b) Houlihan's Selection Of Multiple For Its Terminal Value**

219. In calculating the Debtors' terminal value in the DCF
analysis, Mr. Hardie applied a multiple of 7.0 x EBITDA. UBS Ex.
517 at p. 23.  Mr. Hardie derived his terminal value multiple

---

[18]How this correction affects Mr. Hardie's conclusion of enterprise value
is discussed in ¶231 below.

from his Comparable Transactions analysis. *Id.*

220. The Debtors argue that the Mr. Hardie erred in using the Comparable Transactions analysis to derive the terminal multiple in the DCF analysis and that he should have applied the more common method of using a terminal value multiple derived from the Comparable Companies analysis rather than relying on "stale" transactions.  The Debtors argue that Mr. Hardie should have applied a multiple of 9.1 EBITDA (rather than 7.0 x EBITDA), based upon his observed median Comparable Companies multiple over the last twelve month period.

221. As discussed above, see ¶¶173-176, *supra*, the Debtors are incorrect in arguing that Mr. Hardie should have used the Comparable Companies analysis to calculate terminal value because they ignore that, in using a terminal multiple to calculate terminal value, a valuation expert is attempting to estimate what the company would be worth were it acquired or subject to merger in the terminal year.  By definition, therefore, the appropriate proxy for this value is to be found in a Comparable Transactions analysis as opposed to the Comparable Companies analysis.

**(ii) Comparable Companies Analysis**

222. The Debtors make two criticisms of Mr. Hardie's Comparable Companies analysis.  First, the Debtors challenge Mr. Hardie's use of revenues in his Comparable Companies analysis.

96

Second, the Debtors challenge Mr. Hardie's selection of EBITDA multiples, which the Debtors claim is inappropriately low.  While the Debtors are incorrect on the first argument, their second argument, in part, raises a valid criticism of Mr. Hardie's opinion that must be corrected.

**(a)   Houlihan's Use Of Revenues In Its Comparable Companies Analysis**

223. In conducting his Comparable Companies analysis, Mr. Hardie analyzed EBITDA and revenues and weighed each approach equally. UBS Ex. 517 at p. 21.  The Debtors argue that because the Debtors are a highly profitable enterprise, it is not appropriate to value the Debtors based on a measure of revenues. As discussed above, *see* ¶180, *supra*, the use of revenues in this instance is consistent with standard valuation practice and the controlling law.

**(b)   Houlihan's Selection of Multiples In Its Comparable Companies Analysis**

224. In conducting his Comparable Companies analysis, Mr. Hardie applied multiples of 8.0 – 9.0 LTM EBITDA and 7.5 – 8.5 NFY EBITDA. UBS Ex. 517 at p. 21.  The Debtors argue that Mr. Hardie's selection of EBITDA multiples is too low because Mr. Hardie failed to use the median EBITDA multiples of the comparable companies analyzed, which was 9.1 LTM EBITDA and 8.7 NFY EBITDA.  The Court agrees.

97

225.  As with the other Creditor Parties' experts, Mr. Hardie exercised his judgment to make a downward adjustment without factual support.  Thus, the Court finds that Mr. Hardie should have used a multiple of 9.1 x LTM EBITDA (which is $44.37 million) and 8.7 x NFY EBITDA (which is $44.439 million) in conducting his Comparable Companies analysis.  The use of those multiples results in $403.8 million for LTM EBITDA and $386.5 million for NFY EBITDA, which averages to $395.2 million.  Recall that in conducting his Comparable Companies analysis, Mr. Hardie analyzed both EBITDA and revenues and weighed each approach equally.  By averaging the revised EBITDA value of $395.2 million with the average revenue value (based upon the median) of $293.1 million, Mr. Hardie's corrected conclusion of Nellson's enterprise value - based on the Comparable Companies analysis and exclusive of non-operating assets/liabilities - is $344.2 million.[19]

### (iii) Comparable Transactions Analysis

226. The Debtors make the same criticism of Mr. Hardie's Comparable Transactions analysis that they applied to Mr. Belinsky, *i.e.,* that Mr. Hardie accorded his Comparable Transactions analysis

---

[19] The average revenue value is derived by multiplying the median value of reference range of revenues, which is 0.95 by the LTM revenues (approximately $303 million) and the NFY revenues (approximately $314 million).  The LTM revenue value of approximately $287.9 million is then averaged with the NFY revenue value of approximately $298.4 million to reach the final value of $293.1 million.  How this correction affects Mr. Hardie's conclusion of enterprise value is discussed in ¶231 below.

any weight in reaching his conclusion of enterprise value.  More specifically, the Debtors argue that Mr. Hardie's analysis is not consistent with standard valuation practice because the transactions utilized by Mr. Hardie are not comparable transactions - they are too old and the transactions involve companies that are not comparable to the Debtors.

227. Houlihan identified eighteen comparable transactions. The Debtors argue that because half of these transactions occurred prior to 2004 (UBS Ex. 517 at p. 49) the data was "stale" and it would require a "giant leap of faith" to assume that it could still be relevant in 2006.  Trial Tr. 11/18/06 (Braun) at 3472:11-21. The Debtors further argue that the transactions analyzed by Houlihan did not involve comparable companies.  For example, Houlihan analyzed transactions involving companies engaged in making cat food, salad dressing, "frozen griddle products," and canned vegetables.  UBS Ex. 517 at p. 49.

228. As discussed above (*see* ¶188, *supra*), there is no bright line rule branding transactions occurring more than two years ago as irrelevant for the purposes of conducting a comparable transactions analysis.  Rather, the selection of the appropriate time period during which to analyze prior transactions is subjective, dependent on the specific circumstances, and on the quality of the transactions identified.  Moreover, there was no

evidence presented to the Court establishing that Mr. Hardie's choice of comparable transactions was unreasonable or had a systematic effect of depressing value. Indeed, the highest EBITDA multiple contained in Mr. Hardie's analysis is derived from a transaction involving Jenny Craig – a deal involving a company that the Debtors would argue is not comparable.

229. In sum, Mr. Hardie reasonably exercised his judgment and the Court will not disturb his conclusions.

**(iv) The Debtors' Non-Operating Assets**

230. Mr. Hardie included the value of the Debtors' non-operating assets in reaching his conclusion of the Debtors' enterprise value. UBS Ex. 517 at p. 6. Mr. Hardie determined that the non-operating assets of the Debtors of material value were the Debtors' cash ($17.4 million), excess land in Montreal, Canada ($350,000 - $400,000) and a scheduled income tax refund ($5.0 million) minus the estimated restructuring costs ($9.4 million), which he valued at a total of $13.358 – 13.408 million. *Id.* The Debtors argue that Mr. Hardie's conclusion of enterprise value should include $38.6 million rather than approximately $13.4 million for non-operating assets. For the reasons discussed in ¶¶196-197, *supra*, the Court is not persuaded that Mr. Hardie's valuation of the Debtors' non-operating assets need be adjusted upward or downward.

### (v) Conclusion

231. Mr. Hardie based his conclusion on all three standard methodologies, which he weighed equally.  He then added the value of the Debtors' non-operating assets to reach his conclusion as to the Debtors' enterprise value.  As set forth above, Mr. Hardie made some errors in reaching his conclusion.  Upon correction of those errors, Mr. Hardie's calculation of the Debtors' enterprise value is $331.9 million.  The calculation is set forth below.

| | Corrected Value ($000) | Weight | Weighted Value ($000) |
|---|---|---|---|
| DCF Analysis | $314,200 | 33.3% | 103,686 |
| Comparable Companies Analysis | 344,200 | 33.3% | 113,586 |
| Comparable Transactions Analysis | 306,850 | 33.3% | 101,261 |
| Value Of Operating Assets | | | 318,533 |
| Value of Non-Operating Assets | 13,383 | 100% | 13,383 |
| **Total Enterprise Value** | | | **331,916** |

## D. Conclusion

232. Upon consideration of the arguments of the Debtors and the Creditor Parties and after an independent review of the expert

101

opinions, the Court has determined that the corrected experts'
opinions of the Debtors' enterprise value are as follows:

| Valuation Party | Original Median Value ($000) | Corrected Value ($000) |
|---|---|---|
| Chanin - - UBS' expert | 314,400 | **325,400** |
| FTI - - The Committee's expert | 349,000 | **365,400** |
| Houlihan - - The Informal Committee's expert | 322,000 | **331,900** |

## IV. __Weighing the Expert Opinions__

233. Having adjusted the experts' opinions of the Debtors'
enterprise value, the next task before the Court is to weigh the
three expert opinions (as corrected) based upon the credibility of
each expert's opinion and testimony.

234. Messrs. Belinsky, Braun and Hardie all applied usual and
customary valuation methodologies to reach their conclusions as to
the enterprise value of the Debtors.  Their expert reports and
testimony meet the criteria of admissibility of expert evidence:
qualification, reliability and fit. *In re Nellson*, ___ B.R. ___ ,
2006 Bankr. LEXIS 3186, *19 (Bankr. D. Del. Nov. 29, 2006).
Nonetheless, the Court must examine the qualifications of the
experts and the credibility of their testimony to determine the

weight to give the admissible evidence.  *See Exide Tech*., 340 B.R. at 246.

## A.  Chanin

235.  Mr. Belinsky is an experienced valuation expert.  Mr. Belinsky has received recognition from his professional peers as a valuation expert.  Mr. Belinsky has also had his qualifications accepted by every court in which he has been offered as an expert to render an opinion on enterprise value.  Trial Tr. 10/11/06 (Belinsky) at 2887:3; 2908:4-2908:16; UBS Ex. 501.

236.  The Debtors argue that Mr. Belinsky's testimony should be given little or no weight.  The Debtors point out that Mr. Belinsky was trained as a lawyer and has no formal business valuation credentials or training.  Trial Tr. 10/12/06 (Belinsky) at  3031:3-15.  In addition, on cross-examination, Mr. Belinsky could not identify the names of any seminars that he has attended where the topic of business valuations was discussed.  *Id.* at 3031:21-24.  He could not recall speaking at any seminars on valuation issues within the past ten years and he has never taught a college-level course on the topic.  *Id.* at 3033:24-3034:4; 3034:20-22.  Since graduating from law school, Mr. Belinsky has written a couple of articles, but none of them specifically address valuation issues.  *Id.* at 3034:23-3037:14, 3103:17-19.  He has never contributed to any books on valuations.  *Id.* at 3103:10-12.

103

Finally, he has testified as a valuation expert in two prior cases involving manufacturing companies and has been the senior person involved in issuing a formal valuation opinion on four prior engagements. *Id.* at 3048:12-3049:4.

237. The Court finds Mr. Belinsky to be extremely well qualified despite his lack of formal valuation training. Nonetheless, while Mr. Belinsky was a credible witness, he made some errors in reaching his conclusion that indicate a predisposition to reach a low valuation conclusion for Nellson. That predisposition affects Mr. Belinsky's credibility.

## B.  FTI

238. The Debtors argue that Mr. Braun was the most credible of the three experts.[20]  The Debtors note that Mr. Braun is an accredited valuation professional and a member of the American Society of Appraisers. *See* Official Committee Ex. 1 at p. 10-12. Mr. Braun also has a master's degree in business administration from Harvard University. *Id.* Moreover, Mr. Braun did not know the amount of Debtors' secured debt before he completed his valuation report. *See* Trial Tr. 11/8/06 (Braun) at 3295.15-18.  Mr. Braun did make some errors, however, in performing his DCF analysis.

239. The Court finds Mr. Braun to be extremely well qualified. In addition, despite the errors in his DCF analysis, the Courts

---

[20] This is not surprising as Mr. Braun's opinion of the Debtors' enterprise value was the highest of the three experts.

finds that Mr. Braun was the most credible of the three experts.

## C.   **Houlihan**

240.   Mr. Hardie is an experienced valuation expert.   Mr. Hardie has been accepted by every court in which he has been offered as an expert qualified to render an opinion on enterprise value.   As a managing director of Houlihan, one of the nation's leading financial advisory firms, Mr. Hardie has extensive experience performing enterprise valuations.   As Mr. Hardie testified, every Chapter 11 case requires a financial advisor to render opinions to their clients concerning valuation, whether or not in connection with a formal court process.   Having acted as a financial advisor in more than twenty Chapter 11 cases, Mr. Hardie has extensive experience in the field.   Trial Tr. 11/16/06 (Hardie) at 3649:3-13, 3655:7-22, 3656:12-3657:2, 3658:1-3660:5; UBS Ex. 517 at pp. 31-32.

241.   The Debtors point out that Mr. Hardie was trained as a lawyer and that he has neither formal business valuation credentials nor any training certifications relating to business valuations. Trial Tr. 11/16/06 (Hardie) at 3651:15-3659:5.   In addition, Mr. Hardie did not remember the formula underlying the Gordon Growth model on cross-examination and he miscalculated Nellson's terminal value utilizing this model in his valuation report.   *Id.* at 3830:7-3834:13.

105

242. The Court finds Mr. Hardie to be extremely well qualified despite his lack of formal valuation training.  In addition, while Mr. Hardie was a credible witness, he made some errors in reaching his conclusion that indicate a predisposition to reach a low valuation conclusion for Nellson.  That predisposition and Mr. Hardie's errors in connection with the Gordon Growth model affect his credibility.

D.    **Conclusion**

243. All three expert witnesses are extremely well qualified.  As set forth above, however, there were minor differences in credibility.  Based on those differences in credibility, the Court will not weigh the experts' reports equally.  Rather, the Court will weigh the three expert opinions (as corrected) as follows:

| | Corrected Value ($000) | Weight | Weighted Value ($000) |
|---|---|---|---|
| Chanin - - UBS' Expert | 325400 | 30% | 97620 |
| FTI - - The Committee's expert | 365400 | 40% | 146160 |
| Houlihan - - The Informal Committee's expert | 331900 | 30% | 99570 |
| **Total Enterprise Value** | | | **343350** |

244. Thus, the Court finds that the Debtors' enterprise value - prior to adjustments to compensate for the May 2006 LRP and the Debtors' performance since June 2006 – is $343.4 million.

## V.   Compensating For The May 2006 LRP And The Debtors' Performance Since June 2006

245. Based on (a) the evidence presented at trial showing the May 2006 LRP to have been manipulated at Fremont's direction; and (b) the Debtors' continuing poor performance since June 2006, Messrs. Belinsky, Braun and Hardie all testified that they would now need to reduce significantly their respective valuations in order to give an accurate valuation of the Debtors. *See* ¶¶143-44, *supra*.  Mr. Hardie, who was the only expert that attempted to quantify the reduction, testified that his conclusion would need to be reduced by $30 million. Trial Tr. 11/16/06 (Hardie) at 3754:15-3766; Trial Tr. 11/17/06 (Hardie) at 3855:7-3862:4.

246.  The Court has already found that, as a direct result of the experts' conclusions being based upon the unrealistic May 2006 LRP, all three have necessarily arrived at concluded enterprise values for Nellson, which are themselves somewhat unrealistic. *See* ¶144, *supra*.  Moreover, results since June, 2006 clearly indicate that the Debtors' results continue to trend downwards and that Nellson is already significantly behind the May 2006 LRP. *See* ¶¶120-122, *supra*.

247. Thus, the Court must adjust its conclusion of the Debtors' enterprise value to compensate for the May 2006 LRP and the Debtors' performance since June 2006. The only evidence before the Court on the appropriate reduction is Mr. Hardie's testimony that his conclusion would need to be reduced by $30 million.

248. Mr. Hardie, however, has shown a predisposition to undervalue the Debtors. See ¶242, supra. Nonetheless, the Court has already found that the Debtors will suffer at least a $3 million shortfall for 2006 EBITDA from the projections contained in the May 2006 LRP. See ¶122, supra. Even at Mr. Lenihan's conservative EBITDA multiple of 6 (see ¶46, supra), this suggests that the Debtors value should be lowered by $18 million based solely on the 2006 results. Of course, the Court is making this *ex post* adjustment not solely to compensate for the Debtors' performance since June 2006 but also to compensate for the deliberately inaccurate May 2006 LRP, which affected virtually every aspect of the experts' analyses.

249. Accordingly, the Court will reduce its determination of the Debtors' enterprise value by $24 million. Thus, the Court finds that, as of December 31, 2006, the Debtors' enterprise value is $319.4 million, which the Court will further round to $320 million.

## CONCLUSION

250. For the reasons set forth above and based upon the evidence presented at trial, the Court concludes that, as of December 31, 2006, the Debtors' enterprise value is $320 million. An Order is attached.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In Re:                          )    Chapter 11
                                )    Case No. 06-10072 (CSS)
NELLSON NUTRACEUTICAL, INC.,    )
et al.,                         )    (Jointly Administered)
                                )    Related Docket No. 333
                    Debtors.    )

## <u>ORDER</u>

For the reasons set forth in the Court's Findings of Fact and
Conclusions of Law of this date, the Court concludes that, as of
December 31, 2006, the Debtors' enterprise value is $320 million.


Christopher S. Sontchi
United States Bankruptcy Judge

Dated: January 18, 2007