IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| NELLSON NUTRACEUTICAL, INC.,[1] | ) . Case No. 06-10072 (CSS) |
| | ) (Jointly Administered) |
| | ) |
| Debtors. | ) **Related Docket Nos. 992 and 993** |

**Objection Deadline: March 5, 2007, at 4:00 p.m. prevailing Eastern time**
**Hearing Date: March 12, 2007, at 10:00 a.m. prevailing Eastern time**

## DEBTORS' MOTION FOR RECONSIDERATION IN RESPECT OF CERTAIN FINDINGS OF FACT AND CONCLUSIONS OF LAW RELATING TO THE DEBTORS' ENTERPRISE VALUE

The above-captioned debtors and debtors in possession (the "Debtors" or

"Nellson") hereby move this Court (the "Motion") for reconsideration of certain of those

*Findings of Fact and Conclusions of Law* (together, the "Findings) incorporated as part of the

Court's *Order* dated January 18, 2007, which concludes that the Debtors' enterprise value, as of

December 31, 2006, is $320 million. In support of this Motion, the Debtors respectfully state as

follows:

### Jurisdiction

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2).

---

[1]  The Debtors and the last four digits of each of the Debtors' federal tax identification numbers are as follows:
(a) Nellson Nutraceutical, Inc., a Delaware corporation, Fed. Tax Id. #5044; (b) Nellson Holdings, Inc., a Delaware
corporation, Fed. Tax Id. #0642; (c) Nellson Intermediate Holdings, Inc., a Delaware corporation, Fed. Tax Id.
#0653; (d) Nellson Northern Operating, Inc., a Delaware corporation, Fed. Tax Id. #7694, (e) Nellson Nutraceutical
Eastern Division, Inc., a Delaware corporation, Fed. Tax Id. #8503; (f) Nellson Nutraceutical Powder Division, Inc.,
a Delaware corporation, Fed. Tax Id. #3670; and (g) Vitex Foods, Inc., a California corporation, Fed. Tax Id. #9218.

2.      The legal predicates for the relief requested hereby are Rules 7052, 9023, and 9024 of the Federal Rules of Bankruptcy Procedure.

### Preliminary Statement

3.      By this Motion, the Debtors do <u>not</u> ask the Court to reconsider its valuation conclusion in this case (although they reserve all rights to contest the ruling on appeal). The purpose of this Motion is limited to a single factual issue.

4.      The Debtors request that the Court reconsider all Findings underlying the Court's determination that the Debtors and the Debtors' principal equity holder, Fremont Investors VII, LLC ("Fremont"), "deliberately" overstated or inappropriately manipulated the financial projections in the May 2006 long range business plan (the "May 2006 LRP"). The Debtors submit that such Findings are clearly erroneous, unsupported by the evidentiary record, and unnecessary to the Court's ultimate valuation in the case.

5.      The key here is that the Court can conclude that the May 2006 LRP was perhaps overly optimistic for purposes of valuing Nellson without having to attribute a deceitful motive to the Debtors (or Fremont), and the outcome of this bankruptcy case would be totally unaffected.

6.      The Debtors therefore file this Motion to correct the record and to ensure that all Findings relating to any inappropriate manipulation of the May 2006 LRP (most of which the Debtors believe are unnecessarily pejorative) do not have unfair, indirect consequences on Nellson's business and the morale of its employees and representatives, as well as Fremont. The reputations of the Debtors' key executives and board members have been unfairly and

2

unnecessarily tarnished by the Court's opinion. The same is true of Fremont, which was not extensively involved in the trial.

7.     In sum, the Findings reached by the Court concerning improper motives on the part of Nellson's management and the conduct of Fremont require a leap of faith that the Debtors strongly urge the Court to reconsider because these conclusions are inaccurate and irrelevant to the Court's ultimate determination of the Debtors' enterprise value.

## Applicable Legal Standard

8.     Bankruptcy Rule 7052(b) (which incorporates Rule 52 of the Federal Rules of Civil Procedure and is made applicable to this contested matter by Rule 9014(c)) provides, in relevant part as follows:

> On a party's motion filed no later than 10 days after entry of judgment, the court may amend its findings – or make additional findings – and may amend the judgment accordingly. The motion may accompany a motion for new trial under Rule 59.

FED. R. BANKR. P. 7052(b).

9.     Rule 52(b) allows a court to amend its findings or make additional findings and amend the judgment accordingly. The purpose of this motion is to allow a court to correct manifest errors of law or fact, or in limited circumstances, to present newly discovered evidence. Gutierrez v. Ashcroft, 289 F.Supp.2d 555, 561 (D.N.J. 2003), aff'd, 2005 U.S. App. LEXIS 4502 (3d Cir. 2005); Edwards v. Wyatt, 2007 U.S. Dist. LEXIS 2984 at *4 (E.D. Pa. Jan. 8, 2007).

3

10.    Bankruptcy Rule 9023 (which incorporates Rule 59 of the Federal Rules of Civil Procedure) contemplates the filing of a motion to alter or amend a judgment.[2]

11.    "A motion for reconsideration under Rule 9023 is an extraordinary means of relief in which the movant must do more than simply reargue the facts of the case or legal underpinnings." HHCA Texas Health Servs., L.P. v. LHS Holdings, Inc. (In re Home Health Corp. of Amer.), 268 B.R. 74, 76-77 (Bankr. D. Del. 2001); EBS Pension, L.L.C. v. Edison Bros. Stores, Inc. (In re Edison Bros., Inc.), 268 B.R. 409, 412 (Bankr. D. Del. 2001).

12.    A motion to reconsider must be based on one of three grounds: "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error [of law] or prevent manifest injustice." Id. (quoting North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir.1995). "The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence." Id. (quoting Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir.1985)).

13.    The principal basis underlying the instant Motion is the need to correct clear errors of fact in certain of the Findings.

### Findings That Should Be Reconsidered

14.    The Debtors submit that the fifteen (15) Findings listed below contain manifest errors of fact. Although the Debtors reserve all rights to appeal the Court's valuation decision on any appropriate grounds, the Debtors do not believe that reconsideration of the

---

[2]  The Debtors also file this Motion pursuant to Bankruptcy Rule 9024(b) to correct certain "mistakes" in the Findings.

4

Findings addressed by this Motion will have any effect on the Court's determination of the

Debtors' enterprise value.

### Disputed Finding No. 1

> "The primary source of error is not the experts themselves *but the
> deliberately inaccurate information provided by the Debtors upon
> which the experts relied.*"  Findings at ¶ 5 (emphasis in original).

15.    The May 2006 LRP is a forward-looking projection.  Projections can be

conservative, hopeful, aggressive, aspirational or somewhere "down the middle," but it is very

difficult (if not impossible) to definitively conclude that a projection is deliberately inaccurate.

Indeed, Nellson has <u>never</u> been accused by any party of deliberately misstating its financial

results.  <u>The very nature of a business "projection," as opposed to a historic financial report</u>, does

not lend itself to a degree of accuracy that makes a phrase like "deliberately inaccurate,"

appropriate or meaningful.  After all, no one really knows how Nellson will perform in the

future.

16.    There is also no evidence that the May 2006 LRP contains "deliberately

inaccurate" information, particularly given that (a) Nellson was exceeding its projected EBITDA

goals through August 2006, (b) the time period covered by the May 2006 LRP has just

commenced (years 2007-2011), and (c) the "growth initiatives" which appear to have created the

most concern are common components of long range plans.  It is also commonplace for

companies to "miss" projections.  That does not make the projection "deliberately inaccurate"

when it was made -- it simply means that events did not unfold as hoped.

17.    The Debtors therefore submit that it was clear error for the Court to

conclude that the May 2006 LRP contains deliberately inaccurate information.

## Disputed Finding No. 2

> "The evidence at trial . . . overwhelmingly established that the May
> 2006 LRP was not management's best and most honest thinking
> about the Debtors' financial future but rather was manipulated at
> the direction of and in cooperation with the Debtors' controlling
> shareholder to bolster the perceived value of the Debtors' business
> solely for purposes of this litigation." Findings at ¶2.

18.    The Debtors submit that the overwhelming testimony and documentary

evidence at trial supports precisely the opposite conclusion.  The evidence clearly establishes that

the May 2006 LRP was the product of management's good faith efforts to fashion a credible

business plan for the company.  *Trial Transcript at 557:24-568:5 (Dias Re-Direct), 622:11-18

(Schouten Direct).*[3]  In fact, management stood behind the May 2006 LRP throughout the course

of trial because they created the plan and believed in it.  *Id. at 335:4-10 (Dias Direct), 561:20-

562:3 (Dias Re-Direct).*  Management also provided credible explanations and context for the

principal assumptions that went into the plan.

19.    Moreover, there was no manipulation of the May 2006 LRP by Fremont.

As Messrs. Dias and Schouten repeatedly testified, Fremont's involvement in the May 2006 LRP

was "extremely limited." *Id. at 620:10-12 (Schouten Direct), 241:18-23 (Dias Direct)*

("[Fremont] really had no role.").  The plan was prepared independent of any material influence

by any third party (including Fremont) and without regard to any valuation of the company. *See,

e.g., id. at 231:12-16 (Dias Direct), 610:9-18, 615:2-616:4 (Schouten Direct).*

---

[3]  All references to the "Trial Transcript" are to the unofficial transcript of the valuation trial prepared by Wilcox &
Fetzer, LTD.

20.    The Court's conclusion that the May 2006 LRP was not the result of

management's honest thinking (but rather, manipulations by Fremont) is therefore unsupported

by the weight of the evidence and is simply inaccurate.

### Disputed Finding No. 3

"There is no evidence to suggest that any similar diligence [as
compared to August to November 2005] was pursued in arriving at
the May 2006 LRP." Findings at ¶52.

21.    In fact, there is a compelling evidentiary record outlining the level of

diligence that went into preparing the May 2006 LRP. Certainly, this plan did not take as long to

prepare as the Debtors' "bank" plan in November 2005, but that is explained by the fact that the

Debtors' management was much more familiar with the business, its customers, and its financial

affairs when the May 2006 LRP was prepared.

22.    Nellson management testified at length that: (a) Mr. Dias spoke to

customers exhaustively in preparing the 2006 budget only a month prior to the release of the

May 2006 LRP, *Trial Transcript at 232:11-233:12 (Dias Direct)*; (b) Messrs. Dias and Schouten

were much more familiar with the company in May 2006 than in late 2005 and were well aware

of the inputs provided by other managers, *id. at 633:19-634:5, 636:15-637:17 (Schouten Direct)*;

(c) Nellson had much more stable and accurate financial reporting mechanisms in place by early

2006, *id. at 634:17-23, 635:20-22 (Schouten Direct)*; and (d) there was no need for "outside

meetings" (Nellson management meets every Monday for several hours, *id. at 1157:17-1159:9*

*(Jagiela Re-Direct)*).

7

23.    Given this evidentiary record, it was clear error for the Court to conclude
that there is "no evidence" as to the time and effort invested by the Debtors' management team
in preparing the May 2006 LRP.

### Disputed Finding No. 4

"Both Mr. Schouten and Mr. Dias acknowledged that the lender
version of the November 2005 LRP was their most realistic plan
for Nellson." Findings at ¶61.

24.    The implication here is that the "most realistic" plan is necessarily the
only reasonable or appropriate plan for a company. The November 2005 LRP (and the iterations
thereof prepared in December 2005 and February 2006) were undoubtedly realistic plans for
Nellson (they did not incorporate "growth case" scenarios at all). This conclusion, however,
does not lead to the Court's ultimate Finding that the May 2006 LRP (which did incorporate
growth initiatives) was therefore improper or overstated.

25.    The November 2005 LRP was an ultra-conservative, base plan prepared
specifically for the company's lenders. *Trial Transcript at 769:4-24, 784:7-11, 801:24-802:13
(Schouten Cross)*. The Debtors' projections in this plan were essentially flat. There were no
growth initiatives whatsoever and the assumptions underlying the plans were extremely
conservative. "As stated by Mr. Schouten at trial: "if you couldn't [currently] touch it, see it, or
taste it, it wouldn't get into the November plan." *Id. at 769:7-11 (Schouten Cross)*.

26.    There is no dispute that the November 2005 LRP (and the subsequent
updates thereto) were realistic, but they were not necessarily the right plans for the company in
all contexts. For example, only days after the November 2005 LRP was presented to the lenders,
Nellson presented an alternative version of this same plan to its board of directors (and

8

separately, to Fremont). *Id. at 773:9-774:19 (Schouten Cross)*. This version included certain of

the same or similar growth initiatives ultimately included in the May 2006 LRP. *Id. at 776:8-20*

*(Schouten Cross)*. Does this mean that the plan presented to Fremont in November 2005 was

deliberately inaccurate? No. A company's business plan should be, to a certain degree,

aspirational and challenging.

27.     Yet, the Court concludes that the May 2006 LRP (in contrast to the

November 2005 LRP) was unrealistic because it layered growth initiatives on top of the

company's base business. This Finding is unsupported by the record and clearly erroneous.

### Disputed Finding No. 5

> "After their review of [the proposed February 23, 2006 LRP], Mr.
> Jaunich and Mr. Lenihan (and no other Board members), caused
> several events to occur in early March 2006, which resulted in this
> freshly updated February 2006 LRP being abandoned by
> management in favor of creating a new business plan that would
> 'transform' the Company's outlook by layering 'transformation' or
> 'growth' ideas on top of a base business plan." Findings at ¶77.

28.     There is no proof a causal connection between (a) Mr. Jaunich's

suggestion that Nellson management discuss growth ideas at a board meeting in March 2006,

and (b) Fremont's supposed manipulation of the May 2006 LRP. The May 2006 LRP was not

even the subject of discussion at the board meeting in March and its formulation did not begin

until after Nellson's 2006 budget was approved by the board in April 2006.[4] *See Trial*

*Transcript at 237:12-15 (Dias Direct), 615:12-616:4 (Schouten Direct)*.

---

[4]  The fact that compensation issues were also discussed by the Board in March 2006 is also irrelevant. Findings at
¶79. Annual salary increases and bonuses for all employees are routinely evaluated during this time frame. *See*
*Trial Transcript at 2490:24-2493:20 (Lenihan Direct)*.

DOCS_SF:53116.7

29.     There is also a treasure trove of evidence to the effect that the projections
and assumptions associated with the growth initiatives in the May 2006 LRP (and indeed, the
decision to include them in the first place) were independently formulated by management (with
no input from Fremont whatsoever). *Id.* at 328:7-18 (Dias Direct) ("[N]o one influenced my
decision to include [growth initiatives]. There was no effort to present those ideas to me. It was
my team, me, deciding what we thought was an appropriate plan and presenting it."); *621:20-*
*622:18 (Schouten Direct)* ("[The May 2006 LRP] was my model. I know -- I input every
number. And I know who gave me inputs. No one from Fremont gave me those inputs."). 
Similar growth initiatives were presented by management to Fremont in November 2005. *Id.* at
*773:9-774:19 (Schouten Cross).* Growth initiatives are also normal components of long-term
business projections. *Id.* at 3838:9-3839:16 (Hardie Cross) (noting that Nellson's growth
initiatives are consistent with new product development efforts of comparable companies).

30.     It was clear error for the Court to reject this evidence.

### Disputed Finding No. 6

"Having capitulated to Fremont's demands, Mr. Dias and Mr.
Schouten continued to work with Mr. Lenihan and Mr. Halow over
the next two months to develop a new long-range plan which, as
desired by Fremont's Mr. Lenihan, Mr. Halow and Mr. Jaunich,
would layer 'transformation' concepts onto a base business plan."
Findings at ¶88.

"Fremont (particularly Mr. Lenihan and Mr. Halow) was actively
and heavily involved in the preparation of the May 2006 LRP in
that Fremont dictated the overall framework of the new plan (i.e., a
base plan with growth initiatives layered on), and had extensive
meetings and conversations with Mr. Dias and Mr. Schouten in
regard to the May 2006 LRP." Findings at ¶90.

31.    This simply did not happen. There is no evidence that Fremont was closely involved in the formulation of the May 2006 LRP at any level. Every fact witness in this case who testified to the issue said the same thing: The principal architects of the long-range plan were Messrs. Dias and Schouten (not Fremont). *See, e.g.*, *Trial Transcript at 231:12-16 (Dias Direct), 610:9-18, 615:2-616:4 (Schouten Direct), 996:15-997:4 (Jagiela Direct), 2540:4-21 (Lenihan Direct).* This evidence was unrebutted. It is clear error -- and unnecessary to the Court's holding -- to make a Finding backed only by argument of counsel when unrebutted testimony established the contrary.

32.    There is also no evidence whatsoever that any "lengthy" meetings or phone conversations took place between Nellson management and Fremont representatives in connection with the May 2006 LRP. *Id.* at *620:13-621:2 (Schouten Direct)* ("We had a two-hour meeting and reviewed the model. It was one of those meetings where, frankly, we did most of the talking . . ."). Simply put, Fremont's involvement in the May 2006 LRP was "extremely limited." *Id.* at *620:10-12 (Schouten Direct), 241:18-23 (Dias Direct)* ("[Fremont] really had no role.").

33.    For the Court to conclude otherwise constitutes a manifest error of fact.

### Disputed Finding No. 7

"There is no evidence to support the sudden optimism of the May 2006 LRP. Despite claims by Mr. Schouten and Mr. Dias that the long-range plan needed a 'total rewrite' because of the purported 'turnaround' at the Company and because the assumptions being used in previous LRP iterations were 'quickly becoming old,' this was not true. In reality, the business was struggling at the time Mr. Dias and Mr. Schouten were discarding the February 23, 2006 LRP in favor of Fremont's new 'stretch' plan scenario." Findings at ¶92.

11

34.    Contrary to this Finding, there is <u>clear</u>, <u>objective</u> <u>evidence</u> that Nellson's business was turning around at the time that the May 2006 LRP was prepared. This evidence can be reduced to a single, uncontroverted fact: trailing 12-month EBITDA had improved from approximately $35 million in November 2005 to approximately *$43 million* as of May 2006 (an increase in earnings of nearly 23%). *Trial Transcript at 263:17-264:3 (Dias Direct)*. Of course, the Debtors had to take this undisputed fact into account in fashioning a wholly new business plan for the company -- it would have been unreasonable for them not to do so.

35.    The evidentiary record is also heavily-laden with other commercially reasonable justifications for management's decision to drop the various iterations of the November 2005 "bank" plan in favor of the May 2006 LRP. Management testified that (a) Messrs. Dias and Schouten wanted their own financial model that did not have material input from Fremont; (b) management had been in place long enough to have more familiarity with the business than anyone else; (c) a significant period of time had passed since the November plan and the assumptions incorporated therein had been formulated; and (d) Nellson's financial modeling had improved dramatically since November 2005. *See id. at 636:15-637:17 (Schouten Direct), 802:6-13 (Schouten Cross); 238:19-24, 240:6-13, 243:5-18, 263:1-264:3 (Dias Direct)*.

36.    Taking all these factors together, Messrs. Dias and Schouten came to the logical conclusion that it was time to move beyond the bank plan and start fresh with a clean slate and a realistic, balanced plan for the company. *Id. at 640:23-641:19 (Schouten Direct)* ("I wanted [the May 2006 LRP] to be a realistic, conservative plan that had a high degree of granularity that was easy to understand and would facilitate a lot of people's understanding of the plan.").

37.    Of course, the company continued to face significant risks, including price

pressures and other weaknesses in the market. (Many comparable companies to Nellson face the

same risks, *see id.* at *3896:14-21 (Hardie Cross)* ("Mr. Braun listed . . . the same issues that all

of the comparable companies face")). Management dutifully updated its board about these risks

throughout the course of these cases. But, that does not mean that the company's business plan

should therefore be understated or unnecessarily conservative. As Messrs. Dias and Schouten

testified at length, the various risks facing the company were taken into account in preparing the

May 2006 LRP. *Id.* at *268:21-293:15 (Dias Direct); 644:17-650:23 (Schouten Direct).*

38.    Moreover, the ongoing efforts of Mr. Dias to manage the expectations of

board members about Nellson's performance is not evidence that the company was struggling or

that the May 2006 LRP is overstated. It was clear error for the Court to conclude otherwise.

### Disputed Finding No. 8

> "Neither [growth] idea [in the May 2006 LRP] has progressed
> beyond a conceptual stage and there are no orders for any products
> falling within either growth idea." Findings at ¶100.

> "No market research or customer surveys were prepared in
> connection with the inclusion of the 'growth ideas' in the May
> 2006 LRP and no effort was made to determine whether any
> appetite for these 'transformational ideas' existed in the market.
> Findings at ¶101.

39.    This is not true. The evidence is uncontroverted that Nellson has already

generated approximately $4 million to $5 million in sales through the third quarter of 2006 from

a variety of new breakfast products based on powder technology, including cocoas, oatmeals,

cereals, and instant breakfasts. *Trial Transcript at 1290:5-1296:10 (Cudahy Cross).* These sales

are well ahead of projections in the May 2006 LRP for all of calendar year 2007 (which includes only $3 million in revenues from growth ideas).

40.     Whether any of the breakfast products listed above (or the infamous "soup in a bucket") is actually within the scope of "growth idea no. 1" for purposes of the May 2006 LRP is irrelevant. The point is that Nellson has been plainly successful in commercializing its innovative new products. *Id.* at 684:16-685:2 *(Schouten Cross)* (referring to soup in a bucket as a "third growth idea" that the company is currently selling). This evidence makes it very clear that Nellson's projections for growth initiatives in the May 2006 LRP could not have been (and were not) "deliberately" overstated in the May 2006 LRP. After all, if Nellson is already ahead of projections for growth initiatives in 2006, how can Nellson be accused of "deliberate" inaccuracies in its projections for growth initiatives three years from now?

41.     There are also studies in evidence conducted in connection with Debtors' growth idea no. 1 to further bolster this initiative. *See Debtors' Trial Exhibit Nos. 12-13 (Market Research).* But even in the absence of any formal "market studies," there was no competent testimony that such studies are a necessary precursor in order to substantiate a particular growth initiative. The Debtors' focus has been on direct customer communications in terms of determining whether a market exists for the company's new growth ideas. *Trial Transcript at 307:5-14, 313:16-23 (Dias Direct).*

42.     It was clear error for the Court to reject this evidence and to conclude that neither of the Debtors' growth ideas in the May 2006 LRP is supportable.[5]

---

[5]   The Court also determined that, as of mid-April 2006, mere weeks before the May 2006 LRP was finalized, the Debtors still had not decided which "growth ideas" to include in the plan. Findings at ¶89. In fact, the Debtors have been at the forefront of developing growth initiatives since Mr. Dias joined the company. As Mr. Schouten testified, he first heard the concept of growth ideas "[v]irtually from the day [he] walked in the door." *Trial Transcript at*

**Disputed Finding No. 9**

> "Neither Mr. Dias nor Mr. Schouten could point to a single document demonstrating a so-called discount being factored into the assigned revenues. Rather, they assigned revenue and margin numbers for the growth ideas in their own minds, out of thin air, and then discounted them in their own minds without input from the R&D department, head of powder division, sales department, or head of operations." Findings at ¶104.

43.    This Finding ignores that Nellson had no Vice President of Sales at the time that the May 2006 LRP was prepared. Mr. Dias was not only the CEO of the company, but also head of the sales department. *See Trial Transcript at 190:18-20 (Dias Direct), 619:9-11 (Schouten Dirct), 2631:20-2630:1 (Lenihan Direct).* He was the one who regularly communicated with customers at the highest levels. *Id. at 232:11-24, 265:21-24 (Dias Direct).* Based on his experience with the company and direct contacts with customers, Mr. Dias (with input from the company's R&D department) prepared the company's "growth case" projections. *Id. at 298:24-300:1 (Dias Direct).* These numbers were not "pulled out of thin air" any more than any other projections underlying a company's growth case scenario. Nellson's projections were based on management's experience with the company and direct contacts with customers and were inherently reasonable. *See id. at 3838:9-3839:16 (Hardie Cross)* (admitting that Nellson's growth initiatives do not constitute a substantial portion of the company's projected revenues and are consistent with new product development efforts of comparable companies).

44.    Management also testified at length about the level of conservatism that went into the projections associated with the growth ideas in the May 2006 LRP (ranging from reduced margins and anticipated revenues to significant capital outlays and the decision to

---

*650:24-651:20 (Schouten Direct)* (Mr. Dias "certainly has a passion for growth ideas"). Management also formally presented growth ideas to Fremont as early as November 2005. *Id. at 773:9-774:19 (Schouten Cross).*

identify and attribute revenue to only two specific growth ideas). *Id. at 315:10-324:1 (Dias Direct), 649:17-650:11 (Schouten Direct).* The company actually projected losses from growth ideas in years 2007 and 2008 and the overall revenues and EBITDA improvements expected through the life of the May 2006 LRP are modest in relation to the business as whole (growth initiatives make up approximately 7.8% of total sales in years 2007-2011, *see id. at 3838:20-3839:4 (Hardie Cross)*).

45.    The fact that no specific document was presented to the Court reflecting a discount to the growth ideas in the May 2006 LRP does not prove that such growth ideas were inherently overstated. Indeed, as mentioned above, the company has already realized significant success in 2006 in terms of commercializing new products that was not taken into account by the company when the May 2006 LRP was prepared.

### Disputed Finding No. 10

> "The Board's rejection of Mr. Dias' budget recommendation at the April 7[th] meeting created a $23 million gap in revenue in the May 2006 LRP. Yet, rather than reduce the revenue numbers throughout in the May 2006 LRP, Mr. Dias admittedly "invented" a new revenue category called unallocated revenue." Findings at ¶110.

46.    This Finding is directly controverted by the evidence and is inconsistent with the timeline underlying the formulation of the May 2006 LRP. Nellson's adoption of budgetary targets for 2006 that were higher than those recommended by management did not result in a $23 million revenue gap in the May 2006 LRP. For one thing, the May 2006 LRP did not even exist at that time. Mr. Schouten began preparing the May 2006 LRP in mid-April, after the budget had been finally approved by the board. *See Trial Transcript at 615:12-616:4 (Schouten Direct)* ("The day I stared at a blank computer screen and started populating cells and

16

framing out the model was in mid-April."). The board's approval of the budget for 2006 also did

not predetermine the projections that management incorporated into the May 2006 LRP, which

covered years 2007-2011. Management could have adopted lower projections in those years no

matter what the budget may have been for 2006.

47.     Moreover, even if management's recommended budget targets had been

approved, there still would have been a "revenue gap" of $14 million in the 2006 budget (which

is entirely consistent with the uncontroverted testimony that budgetary revenue "gaps" at some

level are normal). *Id. at 270:22-24 (Dias Direct)* ("It's normal in consumer goods marketing to

have a gap. If you don't have a gap, you are not challenged."). This so-called "revenue gap"

refers to the revenues that were unallocated to specific customers as of the date that the budget

was approved, but which the company fully expected to realize in 2006.

48.     The concept of "unallocated revenue" in the May 2006 LRP was not

created specifically to bridge the gap between what management thought the company could

achieve and the higher budget numbers approved by the board for 2006. *See id. at 271:16-272:4*

*(Dias Direct)* (unallocated revenue is "not something that is just thrown in to justify a high

number. There has to be some category of judgment made as to whether or not it's a reasonable

kind of thing to include."). (As mentioned, there would have been a "revenue gap" even if

management's budget had been approved.) The actual reason that management chose to

incorporate "unallocated revenue" in the May 2006 LRP was to highlight for themselves (and

their staff) the specific hurdles or targets that needed to be overcome (rather than to bury these

challenges in general revenues). *Id. at 268:21-269:19 (Dias Direct)* ("I demand that risks are

called out, because I believe that the likelihood of addressing them improves, and everybody's

17

understanding of the situation improves when you call out such things"); *961:13-963:2*

*(Schouten Re-Direct)*. That does not mean that these revenues are inherently unrealistic. *Id*. To

the contrary, the evidence is clear that, in the judgment of management, the projections in the

May 2006 LRP are achievable. The Court's rejection of this evidence constitutes clear error.

### Disputed Finding No. 11

"During the week that the May 2006 LRP was produced, Messrs. Dias and Schouten suddenly eliminated millions in projected capital expenditures in only the terminal years of the LRP without any input from Mr. Jagiela . . . Not a single witness at Nellson could offer a credible explanation as to why the capital expenditures were suddenly reduced." Findings at ¶111.

"The $6 million figure for projected Cap Ex projected in the terminal year of the May, 2006 LRP is a highly speculative and questionable number – the lowest Cap Ex figure in the Company's recent history." Findings at ¶112.

"This reduction in Cap Ex was instigated by Mr. Lenihan of Fremont." Findings at ¶114.

49.    These Findings are clearly erroneous because both Mr. Schouten and Mr.

Jagiela explained why they <u>both agreed</u> to eliminate certain capital expenditures in the last three

years of the May 2006 LRP. *Trial Transcript at 657:21-658:20 (Schouten Direct), 1000:20-22*

*(Jagiela Direct)*.

50.    These reductions relate solely to cost savings capital expenditures.

*Debtors Trial Exhibit No. 5 at p. 21 (May 2006 LRP)*. Cost savings capital expenditures are

made for the express purpose of saving Nellson money and thereby improving profitability.

*Trial Transcript at 199:14-200:15 (Dias Direct)*. That is, more cost savings capital expenditures

means higher EBITDA.

51.    Management was unable to specifically identify any cost savings capital

projects in the last three years of the May 2006 LRP. *Id. at 657:21-658:20 (Schouten Direct)*,

*1000:20-22 (Jagiela Direct)*. So, as a measure of conservatism, Messrs. Schouten and Jagiela

agreed to reduce the cost savings capital projections for those years (which had the effect of

reducing EBITDA). *Id*. This change was not instigated by Mr. Lenihan of Fremont. *Id*. *at*

*1001:10-17*.

52.     After making the foregoing reduction in cost savings capital expenditures,

the $6 million that remained in projected capital expenditures still exceeds the company's

historical norms in terms of capital spending. *Id*. *at 654:19-655:4 (Schouten Direct)*.

53.     It was manifest error for the Court to ignore this uncontroverted evidence.

### Disputed Finding No. 12

"In the event that sales of any of Nellson's 'transformational ideas'
are made, there is insufficient CapEx in the May 2006 LRP to
support them." Findings at ¶113.

54.     The evidence is directly to the contrary. The May 2006 LRP contains

adequate capital expenditures to support anticipated sales associated with the company's growth

initiatives. *Trial Transcript at 566:5-22 (Dias Re-Direct), 653:17-661:7 (Schouten Direct)*. For

instance, the May 2006 LRP contains $15 million in capital expenditures for a new production

line. *Debtors Trial Exhibit No. 5 at p. 20 (May 2006 LRP)*. Also, Nellson has already budgeted

$200,000 in capital to be spent in 2006 to purchase a "used" cup line that could be used to

manufacture the company's new breakfast products. *Trial Transcript at 1187:17-1189:9*

*(Cudahy Direct)*. Mr. Jagiela agreed that no additional capital expenditures would be necessary.

*Id*. *at 1003:8-16 (Jagiela Direct)*. There is no basis in the record to reject this evidence.

19

### Disputed Finding No. 13

"Another manipulation occurred within days of issuing the May
2006 LRP. The Debtors suddenly added Fiscal Year 2011 to their
LRP with no analysis." Findings at ¶115.

55.    This was not a manipulation -- it was simply an oversight. Without year

2011, the May 2006 LRP only covered four years (2007-2010). In order to correct this error,

Nellson management added year 2011 to the plan to make it a full five-year plan. *Trial*

*Transcript at 395:17-396:1 (Dias Cross), 861:12-21 (Schouten Cross).*

56.    It is true that the projections for year 2011 were higher than in prior years

in the May 2006 LRP, but such increases were completely consistent with the growth rates

otherwise incorporated in the plan. *Id. at 868:18-869:20 (Schouten Cross).*

57.    There is no evidence to support a Finding of improper manipulation here.

### Disputed Finding No. 14

"UBS Exhibit 279 is a draft valuation analysis of Nellson prepared
by Seneca Financial using customary valuation practices . . . In the
analysis, Seneca Financial reached a total enterprise valuation of
only $271 million – far below Fremont's equity hurdle." Findings
at ¶118.

58.    Mr. Harris of Seneca Financial denied preparing UBS Exhibit 279 and

could not identify it. He also rejected the suggestion that this single page document is (or was) a

reflection of his valuation opinion. *Trial Transcript at 1819:5-14 (Harris Cross).*

59.    Moreover, even if this Exhibit could be construed as a "draft" valuation

analysis, such document is irrelevant under the Court's *Revised Order Establishing Dates*

*Regarding Valuation Hearing Related to the Debtors' Enterprise Value Pursuant to Bankruptcy*

*Code Section 506(a)* (Docket No. 383). This order (at ¶7(c)) provides as follows: "Under no

circumstances shall Valuation Parties be required to produce or disclose drafts of Reports."

60.    It was clear error for the Court to rely on UBS Exhibit 279 under these circumstances.

### Disputed Finding No. 15

"In sum, Fremont utilized its control over Nellson to manipulate the business planning and valuation processes to come up with an artificially inflated enterprise value in order to claim some residual value for their existing equity position. There is no other credible interpretation of the evidence before the Court." Findings at ¶119 (emphasis deleted).

61.    For the reasons set forth above, the Debtors submit that this Finding is erroneous and inconsistent with the overwhelming evidentiary record which establishes that there was no improper manipulation of the May 2006 LRP, either by management or Fremont. This Finding is also unnecessary to the Court's ultimate valuation conclusion because the Court could simply conclude that the May 2006 LRP is unrealistic (as opposed to deliberately inaccurate).

62.    Most importantly, however, this Finding is particularly unnerving because it challenges the credibility of the Debtors and Fremont (and has the potential do great harm to personal reputations). The Court's conclusion arises in the context of a forward-looking projection, but no one knows what will happen in years 2009 through 2011 when Nellson projects positive revenues from growth initiatives. The Debtors' management explained their rationale for including such projections -- they honestly believe that these revenue targets are reasonable and can be achieved. Is it possible that Nellson will not meet these projections? Of course, but that will not be determined for years and certainly does not mean that the May 2006 LRP was the result of "deliberate" and improper manipulation.

21

63.    Accordingly, the Debtors submit that each of the Findings referenced above is clearly erroneous and should be reconsidered by the Court.

**Notice**

64.    Notice of this Motion has been given to:  (a) the Office of the United States Trustee, (b) counsel to the Official Committee of Unsecured Creditors, (c) counsel to UBS AG, (d) counsel to Fremont, (e) counsel to the Ad Hoc Committee of First Lien Lenders; and (f) the persons who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that this Court reconsider certain

Findings, enter the attached Order, and grant such other and further relief as this Court deems

just and proper.

Dated: January 26, 2007

PACHULSKI STANG ZIEHL YOUNG
JONES & WEINTRAUB LLP

*Rachel L Werkheiser*

Laura Davis Jones (Bar No. 2436)
Richard M. Pachulski (CA Bar No. 90073)
Brad R. Godshall (CA Bar No. 105438)
Alan J. Kornfeld (CA Bar No. 130063)
Maxim B. Litvak (CA Bar No. 215852)
Rachel Lowy Werkheiser (Bar No. 3753)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email: ljones@pszyjw.com
        rpachulski@pszyjw.com
        bgodshall@pszyjw.com
        akornfeld@pszyjw.com
        mlitvak@pszyjw.com
        rwerkheiser@pszyjw.com

Counsel for Debtors and Debtors in Possession

DOCS_SF:53116.7